IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND JAN 12 PM 1:12



JONATHAN E. DOWLING, individually
and as the personal representative of the
Estate of J.A.D., a deceased minor child
6612 Thurlton Drive
Alexandria, Virginia 22315

      Plaintiff

      And

TO THE USE OF KATHRYN E.
DOWLING

      Plaintiff

vs.

A.R.T. INSTITUTE OF WASHINGTON,
INC.
8901 Rockville Road
Building 10, Suite 2104
Bethesda, Maryland 20889

SERVE: Resident Agent
        Darshana Naik
        18402 Tapwood Road
        Boyds, Maryland 20841

      Defendant

      And

ERIKA CULLINGFORD
10300 Strathmore Hall St., Apt 304
Rockville, Maryland 20852

      Defendant

Civil Action No.: PX    18CV0117

1

## COMPLAINT AND JURY TRIAL DEMAND (COUNTS II – VIII)

I, Plaintiff Jonathan E. Dowling, Lieutenant Commander, Judge Advocate General's Corps, United States Navy, individually, as a surviving parent of J.A.D., a deceased minor, and in my capacity as the personal representative of the Estate of J.A.D. (LCDR Dowling), file this Complaint against Defendant A.R.T. Institute of Washington, Inc. (Defendant A.R.T.), and Defendant Erika Cullingford (Defendant Cullingford) (collectively Defendants), and aver as follows:

## PARTIES

1.     LCDR Dowling is a domiciliary of the State of Washington, and temporarily resides in Virginia on account of military orders. LCDR Dowling, surviving parent of J.A.D., is a primary beneficiary for a wrongful death action pursuant to Maryland Code Annotated Courts and Judicial Proceedings (Md. Cts. & Jud. Proc.) § 3-904.

2.     Kathryn Dowling, a "to the use of" party pursuant to Rule 15-1001(b), Maryland Rules of Procedure, and a surviving parent of J.A.D., is a primary beneficiary for a wrongful death action pursuant to Md. Cts. & Jud. Proc. § 3-904.

3.     The Estate of J.A.D. is a legal entity in the State of Washington. LCDR Dowling is the Personal Representative of the Estate of J.A.D., and has been since February 21, 2014.

4.     Defendant A.R.T. was at all times relevant to this action a registered domestic corporation in Washington, District of Columbia (D.C.), and a registered foreign corporation existing under the laws of the State of Maryland since December 27, 2011.

5.     Defendant Cullingford was at all times relevant to this action an employee of the A.R.T Institute of Washington, Inc., and a resident of Montgomery County, Maryland.

2

## JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. § 1322 (diversity jurisdiction) because the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

7.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2201 (Declaratory Judgment Act) to resolve issues concerning the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 – 2680, and the *Feres* doctrine, *Feres v. United States*, 340 U.S. 135 (1950).

8.      This court has personal jurisdiction over Defendant A.R.T because it was conducting business in Maryland at all times relevant to this action.

9.      This court has personal jurisdiction over Defendant Cullingford because she was employed and living in Maryland at all times relevant to this action.

10.     Venue is proper in this district under 28 U.S.C. § 1391.

11.     As a condition precedent for filing counts II through IV of this Complaint against Defendant A.R.T., Plaintiff filed an Amended Statement of Claim against Defendant A.R.T. before Maryland's Health Care Alternative Dispute Resolution Office (HCADRO) on September 21, 2017, and unilaterally waived arbitration pursuant to Md. Cts. & Jud. Proc. § 3-2A-06B on November 24, 2017 (Exhibit A - Unilateral Waiver of Arbitration; Exhibit B - HCADRO Order dated December 4, 2017). Defendant Cullingford is not a covered health care provider under Md. Cts. & Jud. Proc. § 3-2A-02 subject to HCADRO's jurisdiction.

12.     Plaintiff timely filed due to (1) the tolling of any applicable period for filing under the Servicemembers Civil Relief Act, 50 U.S.C.S. § 3936, (2) Maryland law, (3) equitable tolling, and/or (4) equitable estoppel.

## GENERAL ALLEGATIONS

### A. Nature of Complaint

13.     J.A.D. was born in 2013[1] with severe birth defects involving his heart and abdominal wall that ultimately resulted in his death almost seven months later on October 26, 2013.

14.     Defendant A.R.T. provided artificial fertilization services to LCDR Dowling and his civilian spouse, Kathryn Dowling (Mrs. Dowling) (collectively the Dowlings) at Walter Reed National Military Medical Center (WRNMMC) under a government contract that relieved the government of any responsibility and liability for Defendants' acts or omissions.

15.     Defendants caused J.A.D.'s fatal birth defects by failing to obtain LCDR Dowling's informed consent to use in vitro fertilization (IVF) with intracytoplasmic sperm injection (ICSI), an artificial fertilization procedure that bypasses natural selection and has greater risks than standard IVF, and by negligently and/or fraudulently misrepresenting LCDR Dowling's semen analysis results to obtain or affirm his consent for using ICSI.

16.     Defendants, among other failures to obtain informed consent, wrongly informed LCDR Dowling that his semen sample provided on the day of fertilization, July 6, 2012, was of ICSI standards due to low initial motility.  Defendants failed to inform LCDR Dowling that his initial sperm motility measurement on July 6, 2012 was actually above Defendant A.R.T.'s threshold for using ICSI.  Had this material information been accurately and adequately disclosed, LCDR Dowling would not have consented or affirmed consent to use ICSI to attempt fertilization.

17.     As a consequence of Defendants' actions and omissions, the embryo that became J.A.D. was fertilized through ICSI and implanted in Mrs. Dowling.  J.A.D.'s attending

---

[1] Date of birth not provided pursuant to Federal Rule of Civil Procedure 5.2.

physician/pediatric geneticist at Seattle Children's Hospital opined that using ICSI was the most probable cause of J.A.D.'s fatal birth defects.

**B. Background**

18.     The Dowlings began their efforts at conception in September 2010 after moving to Alexandria, Virginia on account of military orders.  In 2011, the Dowlings began seeing family planning providers at the National Naval Medical Center (NNMC) in Bethesda, Maryland and at the Walter Reed Army Medical Center (WRAMC) in Washington, D.C. after failing to conceive.  These medical centers were consolidated into WRNMMC in Bethesda, Maryland. After several different fertility treatments, LCDR Dowling and Mrs. Dowling decided to pursue IVF at WRNMMC to conceive a child.

19.     Defendant A.R.T. provides embryology services, including IVF and ICSI, to the WRNMMC Division of Reproductive, Endocrinology, and Infertility.  IVF involves sperm being placed in a glass dish where one of those sperm fertilizes an egg through a measure of natural selection.  ICSI involves the health care provider selecting a single sperm and using a pipette to inject the sperm into the egg to achieve fertilization while bypassing natural selection mechanisms.

20.     At all times relevant to this action, Defendant A.R.T. conducted its operations and activities at WRNMMC in Bethesda, Maryland for the benefit of military servicemembers, their dependent spouses, and the children they sought to conceive using Defendant A.R.T.'s services.

21.     Defendant A.R.T. employed health care providers in Montgomery County, Maryland, and acted through its agents, servants, and employees including Darshana Naik, R.N., Dr. Aidita James, Ph.D., Dr. Jacques Cohen, Ph.D., Erika Cullingford, and Leslie Weikert.

22.     At all times relevant to this action, the employees of Defendant A.R.T. were

5

acting within the course and scope of their employment, agency, or servant relationship.

23.     Defendant A.R.T. is vicariously liable for the actions and omissions of its agents, servants, and employees.

24.     Dr. Jacques Cohen, Ph.D., is the President and Scientific Director of Defendant A.R.T.  He is a Senior Editor Emeritus of Reproductive Biomedicine Online.  He served as the Senior Editor for Reproductive Biomedicine Online from 2008 to 2015.  On information and belief subject to additional discovery, Dr. Cohen likely had a role in drafting, reviewing, and/or approving materials intended to obtain informed consent from patients.

25.     Darshana Naik is a Registered Nurse licensed by the State of Maryland, and is Defendant A.R.T.'s only covered health care provider under Md. Cts. & Jud. Proc. § 3-2A-01. Ms. Naik was responsible for coordinating and ensuring patient education, which included providing adequate materials that outlined procedures performed, their risks and benefits, and the indications for these procedures.

26.     Dr. Aidita James, Ph.D., is the Laboratory Director of Defendant A.R.T.

27.     Leslie Weikert is an Embryology Supervisor of Defendant A.R.T.

28.     Erika Cullingford was a Junior Embryologist and is now a former employee of Defendant A.R.T.

29.     In 2012, Defendant A.R.T. conducted quarterly fertilization cycles for approximately 525 female patients with approximately 81% using ISCI (Exhibit C - Defendant A.R.T.'s 2012 Report to Centers for Disease Control and Prevention).  In 2012, the national average for fertility patients using ICSI was 68% based on information from the Centers for Disease Control and Prevention.

30.     Since Defendant A.R.T. incorporated in 2000, the percentage of Defendant

A.R.T.'s patients using ICSI increased from 21% in 2001 to 83% in 2014 based on information provided to the Centers for Disease Control and Prevention.

31.    Defendant A.R.T. charges more money from patients who use IVF with ICSI in comparison to patients who use IVF without ICSI.  In 2012, Defendant A.R.T.'s fee schedule indicated that IVF costs $4809.00 and that ICSI costs $6016.00.

**C. Defendant A.R.T.'s Government Contract**

32.    In 2012, Defendant A.R.T. operated under government contract number W91YTZ-11-P-0231 (2012 Government Contract) (Exhibit D - 2012 Government Contract excerpts).

33.    The 2012 Government Contract provides that Defendant A.R.T. is an independent contractor and is responsible for diagnosis (i.e., low initial motility) and specific medical treatments (i.e., IVF or ICSI):

> It is expressly agreed and understood that this is a nonpersonal services contract, as defined in Federal Acquisition Regulation (FAR) 37.101, in which the professional services rendered by the Contractor are rendered in its capacity as an independent contractor. The Government may evaluate the quality of professional and administrative services provided, but retains no control over professional aspects of the services rendered, including by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments.

> [...]

> This contract is a non-personal services contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision or control usually prevailing in relationships between the government and its employees.

> [...]

> The government will not be liable for malpractice allegations against contract HCP's [(healthcare providers)] based upon performance of this contract.

34.    The 2012 Government Contract contains the following provisions related to

informed consent and Defendant A.R.T.'s responsibility to explain when IVF or ICSI is

indicated:

> This laboratory shall be independent of the clinical laboratory and must meet the rigid requirements of the Society for Assisted Reproductive Technologies (SART), must have applied to SART for membership and paid the required fees.

> [...]

> The Contractor is to provide adequate materials for patient education, including information booklets outlining procedures performed, their risks and benefits and the indications for these procedures.

> [...]

> All services shall be performed in accordance with established principles, practices, and ethics of the medical, nursing and specialty professions/organizations.

35.     In the article, Revised minimum standards for practices offering assisted

reproductive technologies, Fertility and Sterility, Vol. 90, Suppl. 3, S165 - S168, S168

(November 2008) (Exhibit E), the Society of Assisted Reproductive Technology provided the

following standard for informed consent that applied to Defendant A.R.T. in 2012:

> The concept of informed consent is rooted in medical ethics and has been codified as legal principle.  As with all medical procedures and treatments, ART patients have the right to self-determination and must make the final decision as to what is appropriate and acceptable treatment in their particular situation.  To comply with this requirement, each prospective patient/couple must be provided with all relevant information necessary to make an informed decision regarding the proposed treatment and must be given the opportunity to ask questions in order to gain a better understanding.  It is also important that couples are provided with full information concerning risks, benefits, and alternative procedures available to circumvent their specific infertility problem, including procedures that are not performed by the treating center, as well as non-medical options such as adoption and no treatment. (Emphasis added).

### D. February 21, 2012 IVF Orientation

36.     On February 21, 2012, the Dowlings attended an IVF orientation at WRNMMC

hosted by Defendant A.R.T. and the WRNMMC Division of Reproductive, Endocrinology, and

Infertility.

8

37.     During the orientation session, the Dowlings were asked to sign Defendant

A.R.T.'s 12-page consent form (Exhibit F), which is identified as the 2011 version on the bottom

of each page, for the procedures and services performed by Defendant A.R.T.: (1) Consent for In

Vitro Fertilization/Assisted Reproduction (2011 IVF Consent Form), (2) Consent for

Intracytoplasmic Sperm Injection (2011 ICSI Consent Form),[2] (3) Consent for Assisted Hatching

and Fragment Removal, and (4) Consent for Embryo Cryopreservation (collectively 2011

Consent Form).

38.     The 2011 IVF Consent Form indicates that Defendant A.R.T. is responsible for

laboratory portions relating to semen analysis and the fertilization of the eggs:

> We realize that this consent form pertains to the laboratory portion of these procedures.
> We understand that the eggs will be prepared and inseminated in marked dishes with a
> sample of the male partner's sperm after preparation, which removes the sperm from the
> seminal fluid.

39.     The 2011 IVF Consent Form indicates that the male partner will provide two

separate semen samples to be evaluated, one sample provided before the fertilization cycle and

one sample again on the day of egg retrieval for fertilization:

> We understand that before the start of a cycle, the male partner will be asked to supply a
> semen sample for analysis by the andrology laboratory.

[...]

> Once retrieved, the eggs will be incubated in a special solution (culture medium) and
> evaluated for timing of insemination. We understand that a sample of semen from the
> male partner, obtained by masturbation in a private collection room near the laboratory,
> will be evaluated, prepared, and used for insemination.

40.     As for the overall risks of IVF, the 2011 IVF Consent Form states the following:

Based on current medical knowledge, we understand there does not appear to be a higher

---

[2] Defendant A.R.T.'s 2000 ICSI Consent Form, which is identified as version 01/03/2000 on the
bottom of each page, is a 3-page stand-alone consent form that has its own signature block on the
last page. Unlike Defendant A.R.T.'s 2011 Consent Form, the stand-alone 2000 ISCI Consent
Form allowed patients to separately consent to IVF while not having to consent to ICSI.

incidence of birth defects associated with IVF procedures. However, there is not at present sufficient statistical data available to definitively conclude that this is so.

41.    The 2011 ICSI Consent Form states that "the ICSI procedure is performed when the sperm may not be judged adequate to achieve fertilization using conventional insemination (putting the eggs and sperm closely together)." The 2011 ICSI Consent Form does not list the parameters and the values used for judging whether sperm is adequate to achieve fertilization.

42.    Defendant A.R.T.'s 2011 ICSI Consent Form lists the following risks or disadvantages:

> The eggs may be damaged during the ICSI procedure. Serious damage that threatens egg viability actually occurs in less than 10% of the eggs. Some batches of the eggs may be over-sensitive resulting in higher damage rates.

> [...]

> This technology is relatively new (started in 1992), and there may be unknown risks to the baby or the mother.

> [...]

> While there seems to be no higher overall incidence of congenital malformations in children born after ICSI with using either regular sperm or epididymal or testicular spermatozoa, the risk cannot be totally ruled out.

43.    The 2011 ICSI Consent Form provides the following for terminating consent:

> At any time prior to egg retrieval, we understand that we may cancel our consent for performance of the ICSI procedure; however, once egg retrieval has taken place, irrevocable steps for the performance of ICSI will occur.

44.    During the orientation, the Dowlings paid a non-refundable $481.00 deposit to Defendant A.R.T.

**E. March 7, 2012 Paxil Prescription and Semen Analysis Test**

45.    On March 7, 2012, LCDR Dowling was prescribed Paxil by a personal services contractor at WRNMMC who did not provide information concerning the side effects of Paxil on

male reproductive fertility and sperm. Personal services contractors are considered government employees under the Federal Tort Claims Act.

46.    Paxil, also known as paroxetine, has been shown to cause abnormal DNA fragmentation in sperm. The article, Adverse effect of paroxetine on sperm, Fertility and Sterility, Vol. 94, No. 3, 1021-1026, 1024 (Aug. 2010) (the Paxil study) (Exhibit G), provides the following:

> In this study, we have demonstrated that marked changes in sperm DNA fragmentation occur during paroxetine treatment that are not reflected by changes in standard semen parameters. Not only did mean DNA fragmentation levels increase from 13.8 to 30.3% on paroxetine, but the percentage of patients with abnormal DNA fragmentation ($\geq$30%) rose from 9.7% to 50%. Integrity of DNA is important to normal fertility and affects the success of intrauterine insemination. Abnormal sperm DNA integrity also affects pregnancy outcomes with the most advanced assisted reproductive technologies. The threshold of $\geq$30% sperm DNA fragmentation has been suggested as a cut-off to identify men with poorer fertility. The fivefold increase in the number of patients who developed abnormal sperm DNA integrity while taking paroxetine in this study is unsettling. Although fertility was not directly assessed in this study, these marked changes in the DNA integrity of sperm suggest an adverse fertility effect related to paroxetine use.

47.    On March 7, 2012, LCDR Dowling provided a semen sample to Defendant A.R.T. and Defendant Cullingford for evaluation. Defendant A.R.T. provided a 2-page form titled Semen Analysis for ART Program (March 7, 2012 Semen Analysis Form). On the first page of this form, LCDR Dowling handwrote "Paxil – start today" next to a prompt asking about prescription information. The second page of this form listed several semen parameters including motility and progression, which were not accompanied by any normal or reference values that Defendant A.R.T. used to evaluate semen. After LCDR Dowling left the laboratory, Defendant Cullingford and Leslie Weikert processed and analyzed his sample.

48.    On or about April 14, 2012, Defendant A.R.T. generated a billing statement, which indicated the Dowlings would be charged for the ICSI procedure based on the amount

charged. Mrs. Dowling called an employee of Defendant A.R.T. who indicated that the Dowlings were being charged for ICSI due to LCDR Dowling's sperm having low initial motility based on the March 7, 2012 results.

49. On May 14, 2012, the Dowlings made a payment of $5,535 to Defendant A.R.T. on the balance due for the ICSI fertilization procedure.

**F. July 2012 Semen Analysis Test, Fertilization Procedure, and Pregnancy**

50. Defendant A.R.T. and the WRNMMC Division of Reproductive, Endocrinology, and Infertility scheduled Mrs. Dowling to have her oocyte retrieval and fertilization procedure on July 6, 2012.

51. In the early hours of July 6, 2012, LCDR Dowling found an online news article, NewYork-Presbyterian/Weill Cornell Study Shows Abnormal Sperm DNA Fragmentation in Half of Men Taking an SSRI, dated June 11, 2009. This article reported a link between Paxil and DNA fragmentation in sperm and associated compromised fertility and poor pregnancy outcomes. The news article indicated that normal levels of DNA fragmentation returned one month after discontinuing Paxil.

52. LCDR Dowling discussed the article with Mrs. Dowling who wanted to receive WRNMMC physicians' advice prior to making any decisions about freezing her oocytes and delaying the fertilization procedure.

53. On the morning of July 6, 2012, the Dowlings arrived at WRNMMC for LCDR Dowling's semen collection and Mrs. Dowling's oocyte retrieval procedure.

54. LCDR Dowling and Mrs. Dowling reported their concerns about Paxil to a military medical provider who indicated that sperm is formed months in advance of ejaculation and stated words to the effect of, "We don't know half the medications that men are taking, but

everything turns out fine."  The military medical provider stated that the risk regarding LCDR Dowling's ingestion of Paxil was "negligible" in moving forward with fertilization.  Military medical providers are considered government employees under the Federal Tort Claims Act.

55.     On July 6, 2012, Defendant A.R.T. provided LCDR Dowling a 2-page form titled Semen Collection and Analysis for IVF/ICSI (July 6, 2012 Semen Collection and Analysis Form) (Exhibit H).  On the first page next to prompt concerning prescription information, LCDR Dowling wrote "Paxil (10 mg)" followed by a note stating "Doctor did not provide information on impacts on sperm.  Discovered study last night on internet."

56.     LCDR Dowling provided a semen sample that Defendant Cullingford analyzed. Defendant Cullingford filled in portions on page 2 of the July 6, 2012 Semen Collection and Analysis Form listing the prewash motility at 48% and the prewash progression at 40%.  The form concluded with the following statement (underlined text below indicates handwritten text):

The sample that has been prepared is of ICSI standards. (Therefore [circled]/However), your oocytes will undergo ICSI in order to obtain fertilization.  If ICSI is needed and has not already been paid for, a bill for the difference will be sent.  Your initials indicate that you agree to the procedure listed above.
Patients Initials: _____          ICSI (if applicable) due to: Low Initial Motility

57.     LCDR Dowling understood the statement above to mean that his semen sample given on July 6, 2012 was of ICSI standards because his sperm had low initial motility.  Based on this understanding, LCDR Dowling signed page 2 of the July 6, 2012 Semen Collection and Analysis Form consenting to use ICSI to achieve fertilization.

58.     After LCDR Dowling signed page 2 of the July 6, 2012 Semen Collection and Analysis Form, seventeen oocytes were retrieved during Mrs. Dowling's egg removal procedure. Defendant A.R.T. selected twelve individual sperm cells to fertilize twelve of these oocytes using ICSI.  By July 9, 2012, only 7 day-3 embryos remained.  By July 11, 2012, only 5 day-5

blastocysts remained.

59.     On July 11, 2012, Mrs. Dowling underwent embryo transfer, and one embryo –
the embryo who would develop into J.A.D. – was transferred into her endometrial cavity.

60.     With the exception of one embryo that was frozen and that is still held by
Defendant A.R.T., the remaining 3 blastocysts self-terminated and had (Icm/Tr) score of C/C,
which represents a poor score under the SART grading system.

61.     On July 20, 2012, lab results revealed Mrs. Dowling's elevated HCG level,
indicating that she was pregnant.

**G. Relocation to Washington and J.A.D.'s Prenatal Diagnosis of Pentalogy of Cantrell**

62.     In September 2012, the Dowlings moved to Poulsbo, Washington on account of
military orders.

63.     On January 10, 2013, based on a third trimester ultrasound and examination,
J.A.D. was diagnosed with pentalogy of Cantrell.  Pentalogy of Cantrell has five findings
characteristic to the syndrome:  a deficiency of the anterior diaphragm, a midline supraumbilical
abdominal wall defect, a defect in the diaphragmatic pericardium, various congenital intracardiac
abnormalities, and a defect of the lower sternum.  Medical literature indicates that pentalogy of
Cantrell is caused by embryological development failure of a segment of the lateral mesoderm
between days 14 and 18 of gestation.

64.     After receiving J.A.D.'s prenatal diagnosis, the Dowlings signed release forms to
obtain medical records from Defendant A.R.T. and received, among other documents, a typed 1-
page form titled Semen Analysis Report, which was dated March 15, 2012, for the March 7,
2012 semen sample (March 15, 2012 Semen Analysis Report) (Exhibit I).  This report shows the
semen analysis results for several semen parameters, including progression and motility, and

Defendant A.R.T.'s respective normal values in an accompanying legend.

65.     The March 15, 2012 Semen Analysis Report shows that LCDR Dowling had a prewash motility of 39% and that Defendant A.R.T.'s normal value for motility was ">40%" as stated in the legend.  The comments state "ICSI Low initial motility" at the bottom of the report.

66.     In an email dated February 14, 2013 concerning the March 15, 2012 Semen Analysis Report (Exhibit J), LCDR Dowling asked the following:

> (2) What is meant by low initial motility?  The comments on my 3/7/2012 Semen Analysis Report state the following: ICSI Low initial motility.  Is that referring to the fact that my prewash motility was at 39%, which appears to be below the cutoff of 40%, on this report?

67.     In a responsive email dated February 14, 2013 (Exhibit J), Lieutenant Commander Rebecca Chason, Medical Corps, United States Navy, Assistant IVF Director at WRNMMC, responded:

> I have confirmed that the answer to question #2 is that low initial motility is a term used by our lab when the prewash motility is <40%.[3]

68.     LCDR Chason's email and other representations by Defendant A.R.T. indicate that Defendant A.R.T.'s use of ">40%" as a threshold in the March 15, 2012 Semen Analysis Report should actually state "≥40%" as a threshold, and is likely the result of person creating the form not inserting the appropriate symbol (> instead of ≥).

69.     LCDR Dowling underwent semen analysis in February 2013 in order to determine his baseline DNA fragmentation.  At that juncture, he had not taken Paxil since October 2012.  Based on his February 2013 sperm sample, using the same lab and testing procedure identified in the Paxil study (i.e., TUNEL assay), LCDR Dowling's baseline DNA fragmentation level was

---

[3] Exhibit J is an email chain that LCDR Dowling forwarded to Mrs. Dowling after receiving LCDR Chason's response.  LCDR Dowling wrote "Low Initial Motility does refer [to] semen below 40% cut-off.  They exposed us to unnecessary risk with ICSI because my pre-wash motility on the transfer [sic] was 48%."

reported at 26%.

70.     Based on the average increase found in the Paxil study, which demonstrated statistical significance, the likely DNA fragmentation level in LCDR Dowling's sperm in July 2012 was approximately 42%. According to the Paxil study, ≥30% DNA fragmentation in sperm is classified as abnormal DNA fragmentation.

71.     LCDR Dowling likely had abnormal DNA fragmentation in July 2012 when his sperm was used to fertilize an oocyte that developed into J.A.D.

## H. J.A.D.'s Birth and Death

72.     J.A.D. was born in 2013[4] at the University of Washington Medical Center, at approximately 40 weeks four days gestation.

73.     At birth, J.A.D. exhibited several birth defects consistent with pentalogy of Cantrell including a double outlet right ventricle heart defect, a posterior displacement of the superior vena cava, an abnormal pericardium, a ventral hernia, a medium-sized omphalocele, a malposed stomach, and a missing xiphoid process.

74.     On April 22, 2013, when he was three weeks old, J.A.D. underwent an intraventricular baffle closure of the ventricular septal defect, a transannular patch augmentation of the right ventricular outflow tract, a patch closure of the atrial septal defect, and a patent ductus arteriosus ligation.

75.     J.A.D. underwent chest closure surgery on April 28, 2013 and was extubated on April 30, 2013. He remained hospitalized until May 10, 2013.

76.     Prior to his death, J.A.D. underwent an additional open-heart surgery, a follow-on chest closure surgery, three catheter procedures, and spent over eighty-five non-consecutive days hospitalized at Seattle Children's Hospital.

---

[4] Date of birth not provided pursuant to Federal Rule of Civil Procedure 5.2.

16

77.     On October 18, 2013, the Dowlings met with J.A.D.'s medical team to discuss treatment options. J.A.D.'s medical team indicated nothing more could be done to save J.A.D., and recommended that the Dowlings begin home hospice care with a treatment goal of comfort and quality of life.

78.     On October 26, 2013, J.A.D. died at home. The Dowlings held him as he took his last breath.

## I. Opinion of J.A.D.'s Attending Physician/Pediatric Geneticist

79.     On February 15, 2014, Dr. Margaret Adam, MD, MS., J.A.D.'s attending physician/pediatric geneticist at Seattle Children's Hospital, based on a differential diagnosis/etiology, found that LCDR Dowling likely had significant abnormal DNA sperm fragmentation when J.A.D. was conceived, which was supported by two studies that showed statistically significant correlations between Selective Serotonin Reuptake Inhibitors (SSRIs) and sperm DNA fragmentation, and concluded that using ICSI with sperm impacted by significant abnormal DNA fragmentation and the other impacts associated with ICSI were the most probable causes of J.A.D.'s birth defects. (Exhibit K - Dr. Adam's opinion).[5]   Using ICSI to achieve fertilization caused J.A.D.'s conception and birth defects.

80.     Medical and scientific literature referenced in Dr. Adam's opinion and published before July 6, 2012, the date of J.A.D.'s conception, indicate that using ICSI increases the risk for embryological development failure, spontaneous abortion, and birth defects, especially when ICSI is used with sperm impacted by significant abnormal DNA fragmentation.

81.     The article, Reproductive Technologies and the Risk of Birth Defects, New England Journal of Medicine, New England Journal of Medicine, Vol. 366, No. 19, 1803 – 1813, 1809 (May 10, 2012), provided the following:

---

[5] Exhibit K does not include the referenced consultations.

After multivariate adjustment, the association between IVF and the risk of any birth defect was no longer significant, whereas the increased risk of any birth defect associated with ICSI remained significant.

82.     The article, Meta-analysis of sperm DNA fragmentation using the sperm chromatin structure assay, Reproductive BioMedicine Online,[6] Vol. 12, No. 4 (2006) 466-472, 467, provided the following:

Intracytoplasmic sperm injection (ICSI) appears to significantly overcome some negative effects of elevated sperm DNA fragmentation [citations omitted]; however, elevated sperm DNA fragmentation is of concern due to the association between assisted reproductive techniques and increased rates of birth defects [citations omitted]. The relationship between elevated sperm DNA fragmentation and increased rate of birth defects is shown by the trend for increased spontaneous abortions in several ICSI studies where pregnancies were obtained even though the sperm DNA fragmentation was elevated [citations omitted].

83.     The article, DNA fragmentation of normal spermatozoa negatively impacts embryo quality and intracytoplasmic sperm injection outcome, Fertility and Sterility, Vol. 94, No. 2, 549 - 557, 556 (July 2010), "demonstrated that the DNA fragmentation in morphologically normal spermatozoa has a statistically significant negative effect on embryo quality and pregnancy outcomes in ICSI patients[.]" It further provided:

The clinical introduction of ICSI has allowed many infertile men with severely affected sperm parameters the opportunity to become genetic fathers. However, ICSI is a more invasive technique than conventional IVF and bypasses the process of natural sperm selection. An increased risk of chromosomal abnormalities has been shown in ICSI offspring. In addition, a significant increase in urogenital problems in male children born after ICSI was reported in a Swedish study. Others have also reported an association of major cardiovascular, urogenital, chromosomal, and musculoskeletal defects with the use of ICSI. Because selection for ICSI is based on sperm motility and normal morphology, and because sperm with damaged DNA cannot be recognized during the routine laboratory selection procedure, the inadvertent injection of spermatozoa with DNA damage into oocytes might be determinant of some of these problems.

84.     The article, Is sperm DNA damage associated with IVF embryo quality? A systematic review, Journal of Assisted Reproduction and Genetics (2011) 28:391–397, which

_____

[6] This is the same journal that Dr. Cohen, Defendant A.R.T.s President, served as Senior Editor.

entailed a meta-analysis of 28 different studies, found "that the influence of sperm DNA damage on embryo quality/development may be more significant in ICSI compared to IVF cycles[,]" and provided the following:

> With ICSI, on the other hand, natural selection barriers are bypassed entirely and fertilization with highly DNA fragmented sperm is possible. Although this damage may also be repaired in the oocyte, excessive damage may potentially result in early reproductive failures (e.g. poor embryo quality or development). Avendano et al., have reported that in semen samples with teratozoospermia, even the morphologically normal spermatozoa (as would be hand-selected for ICSI) may possess high levels of DNA damage. Experimental ICSI studies have shown that sperm DNA damage will result in poorer embryo development.

## J. Seeking Accountability of the Government

85.    In September 2014, the Dowlings moved to San Diego, California on military orders.  LCDR Dowling later retained the services of a law group that represents military members, retirees, and their families against the United States of America for medical malpractice committed by medical providers employed by the military and/or the Veterans Administration.  The law group is a component of a firm that defends private medical providers, practice groups, and health clinics.

86.    In an October 30, 2015 letter denying the Dowlings' administrative claims under the Federal Tort Claims Act (Exhibit L), the government stated the following:

> One reason for this decision is that your clients' claims for personal injury and wrongful death are barred by the Supreme Court decision in *Feres v. United States*, 340 U.S. 135 (1950). The Appellate Courts that have decided the issue have uniformly barred recovery for birth defects injuries when the genesis of those injuries is associated with injuries to service members. To the extent your clients' causes of action are based on allegations that [J.A.D.]'s death from Pentalogy of Cantrell was caused by DNA fragmentation from the Paxil LCDR Dowling was prescribed, then the genesis of those injuries is from the alleged injury to the service member and is barred by *Feres*. *See Mins v. United States*, 155 F.3d 445, 449 (4th Cir. 1998); *Hinkie v. United States*, 715 F.2d 96, 98 (3d Cir. 1983); *Laswell v. Brown*, 683 F.2d 261, 269 (8th Cir. 1982); *Monaco v. United States*, 661 F.2d 129, 133 (9th Cir. 1981); and *Ortiz v. United States*[,] 786 F.3d 817 (10th Cir. 2015).

> To the extent these causes of action are from allegations that the DNA fragmentation and

risks of birth defects were increased by in vitro fertilization with intracytoplasmic sperm injection, the decision on the manner by which the in vitro fertilization was carried out was made by a third party, Assisted Reproductive Technologies Institute of Washington [sic]. The United States is not responsible for the acts and/or omissions of independent contractors. See 28 U.S.C. § 2671.

87. On November 25, 2015, LCDR Dowling and Mrs. Dowling, through counsel, filed an amended complaint against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 – 2680, for medical malpractice occurring in the State of Maryland (Count I: Informed Consent, Count II: Survival Action Informed Consent) and the State of Washington (Count III: Wrongful Birth). (Available court record, *Dowling, et al. v. United States of America,* U.S. District Court for the Western District of Washington, Case No. C15-5847-RBL).

88. In an Answer filed on February 4, 2016, the government asserted, citing *Feres v. United States*, 340 U.S. 135 (1950), that the "lack of informed consent and survival action are not actionable as the injuries alleged arise out of activity incident to Plaintiff LCDR Dowling's military service." The government also asserted that "Plaintiffs' injuries and damages, if any, were caused by the negligent acts or omissions, wrongdoing,[7] or failure to exercise due care on the part of others over whom the United States has no control." (Available court record, *Dowling, et al. v. United States of America,* U.S. District Court for the Western District of Washington, Case No. C15-5847-RBL).

89. On June 22, 2016, LCDR Dowling signed a settlement agreement with the government pursuant to 28 U.S.C. § 2677 while aboard the USNS MERCY (T-AH 19) during a five-month deployment to Southeast Asia (Exhibit M - Settlement Agreement redacted). This statutory authority, 28 U.S.C. § 2677, provides that the "Attorney General or his designee may

---

[7] The government's claim of wrongdoing provided Plaintiff notice that the actions of Defendant A.R.T. and Defendant Cullingford were intentional rather than merely negligent.

arbitrate, compromise, or settle any claim cognizable under section 1346(b) of this title, after the commencement of an action thereon." Claims against independent contractors are not cognizable claims under 28 U.S.C. § 1346(b). The settlement agreement covers the government and individuals, either in their individual or official capacity (a term of art that refers to government actors who are able to act in an individual or an official capacity), and specifically recognizes that the Dowlings may pursue "further litigation or the prosecution of claims [...] against any third party" including Defendant A.R.T. and Defendant Cullingford.

## K. Seeking Accountability of Defendant A.R.T. and Defendant Cullingford

90. On April 24, 2017, LCDR Dowling wrote Defendant A.R.T.'s legal counsel asking the following:

> Why was this July 6, 2012 semen analysis form marked for ICSI due to low initial motility when my prewash motility was above the cutoff for low initial motility? Was it a mistake, or was it intentional based on my semen analysis results obtained in March 2012 where I had a prewash motility of 39%.

91. On April 25, 2017, Defendant A.R.T.'s legal counsel responded with the following:

> I am informed that you are correct that the reference to low initial motility noted on what you reference as "the July 6, 2012 semen analysis form" (actually, page 2 of a form titled "Semen Collection and Analysis for IVF/ICSI") is based on the results of the analysis of your semen obtained on March 7, 2012, which is set forth on a form of that date.

92. In July 2017, the Dowlings moved to Alexandria, Virginia on account of military orders. On July 5, 2017, LCDR Dowling filed a Statement of Claim with Maryland's Healthcare Alternative Dispute Resolution Office (HCADRO) against Defendant A.R.T. for various counts including informed consent, intentional misrepresentation, and negligent misrepresentation.[8]

93. On August 28, 2017, Dr. James, Defendant A.R.T.'s laboratory director,

[8] The Amended Statement of Claim only included the claims related to informed consent.

explained in an affidavit that the recommendation to use ICSI on the July 6, 2012 Semen
Collection and Analysis Form was based on LCDR Dowling's motility results obtained from a
September 13, 2011 semen sample provided to government medical providers (39%), which she
described as "a low motility value (<40%)" under World Health Organization (WHO) standards,
and the March 7, 2012 semen sample (39%), which she described as "less than the 40%
threshold" under the WHO standards used by her laboratory.  Dr. James stated that LCDR
Dowling's "laboratory values, including sperm motility, were then compared to WHO
standards."  Dr. James stated that a third semen analysis result that was above the motility
threshold would not change Defendant A.R.T.'s recommendation to use ICSI.

94.    The *WHO laboratory manual for the examination and processing of human
semen* (2010, 5th and current Edition) (2010 WHO Semen Manual) (Exhibit N - 2010 WHO
Semen Manual excerpts) and Defendant A.R.T provide the following reference or normal values
for motility and progression, both of which indicate that LCDR Dowling's motility on July 6,
2012 was at or above the thresholds for using standard IVF:

| 2010 WHO Semen Manual Parameters | 2010 WHO Lower Reference Values | Defendant A.R.T.'s 2012 Semen Parameters | Defendant A.R.T.'s 2012 Normal Values (per Dr. James representations) | LCDR Dowling's July 6, 2012 semen analysis results |
|---|---|---|---|---|
| Total Motility (PR + NP %) | 40 (38-42) | Motility (%) | ≥40 | 48 |
| Progressive Motility (PR%) | 32 (31-34) | Progression (%) | ≥40 | 40 |

95.    LCDR Dowling's two motility results in September 2011 (39%) and March 2012
(39%) were within the WHO lower reference range for motility (40(38-42)).

96.    Defendant A.R.T.'s 2015 Consent Form (Exhibit O) still does not provide the
parameters for judging the adequacy of sperm to achieve fertilization, but now acknowledges

that there is a higher risk of birth defects with assisted reproductive technologies:

> Based on current medical knowledge, we understand there may be a higher incidence of birth defects in couples who undergo assisted reproductive technologies. It is unclear the factors to account for the increased rate of birth defects (infertility diagnosis, age, ovarian stimulation medications, non-IVF medications from female or male, culture media, oocyte and embryo manipulation, IVF/ICSI procedures).

97.     Defendant A.RT.'s 2015 Consent Form now acknowledges that the "current medical literature suggests there may be a higher incidence of congenital malformations in children born after ICSI with using either regular sperm or epididymal or testicular spermatozoa."

98.     Defendant A.RT.'s 2015 Consent Form does not specifically alert patients about the risks of using ICSI with sperm impacted by significant abnormal DNA fragmentation or the medications that may cause such DNA fragmentation in sperm.

99.     Defendant A.R.T. now operates under an agreement with WRNMMC signed by Dr. Cohen on September 23, 2016 (2016 Operating Agreement) (Exhibit P).    The 2016 Operating Agreement details and/or clarifies Defendant A.R.T.'s responsibilities that were in effect in 2012, which include the following:

> [Defendant A.R.T.] Shall not engage in any actions that may give the appearance that it is acting as a part of or the agent for the WRNMMC, or otherwise may result in incurring of costs or other liability on the part of WRNMMC or the Government.

> [...]

> Provide evaluation of semen as to the appropriateness of In Vitro Fertilization (IVF) or Intracytoplasmic Sperm Injection (ICSI) and performance of ICSI when indicated.

> [...]

> Obtain informed consent from patients for laboratory-associated procedures.

## CLAIMS FOR RELIEF

### COUNT I

DEFENDANT A.R.T. AND DEFENDANT CULLINGFORD - DECLARATORY JUDGMENT
CONCERNING THE FEDERAL TORT CLAIMS ACT AND THE FERES DOCTRINE

100.    Plaintiff adopts by reference the allegations contained in paragraphs 1 through 99
of this Complaint with the same effect as if herein fully set forth.

101.    Defendant A.R.T contends that the Dowlings' settlement agreement with the
government pursuant to the Federal Tort Claims Act bars any action against Defendant A.R.T
and its employees, and that it is entitled to a reduction of any verdict or judgment under Md. Cts.
& Jud. Proc. § 3-2A-09, which caps non-economic damages for claims subject to HCADRO
jurisdiction.

102.    Defendant A.R.T is an independent contractor of the government, and Defendant
A.R.T. and Defendant Cullingford are not agents, servants, or employees of the government.

103.    Based on the application of the *Feres* doctrine for the Maryland claims against the
government, the Dowlings' settlement agreement with the government compensates them for
their damages under their wrongful birth claim in the State of Washington.  The State of
Washington has no cap on non-economic damages, and the non-economic damages for wrongful
birth factor in the emotional benefits to the parents resulting from the child's birth.

104.    The *Feres* doctrine bars third-party claims against the government as provided in
*StencelAero Engineering* Corp. *v. United States*, 431 U.S. 666 (1977).  The Defendants are
responsible for all damages under Maryland law even though the government may be partially at
fault as provided in *Vulcan Materials Co. v. Massiah*, 645 F.3d 249, 255-56 (4th Cir. 2011).

105.    LCDR Dowling seeks declaratory judgment that the Dowlings' settlement
agreement with the government under the Federal Tort Claims Act does not bar this action
against Defendant A.R.T. and Defendant Cullingford, and that the application of the *Feres*
doctrine prevents Defendants from seeking an offset of non-economic damages under Maryland

24

law and the economic damages that are provided for under Maryland law.

## COUNT II

### DEFENDANT A.R.T. - VICARIOUS LIABILIY INFORMED CONSENT

106.    Plaintiff adopts by reference the allegations contained in paragraphs 1 through 105 of this Complaint with the same effect as if herein fully set forth.

107.    As a provider of medical services to and for the benefit of the Dowlings, Defendant A.R.T. and its agents, servants, and employees owed the Dowlings a duty to provide them medical care consistent with the governing standards for providing informed consent, which is based on a standard of reasonable conduct, not a professional standard of care.

108.    Defendant A.R.T. and its agents, servants, and employees owed a duty to the Dowlings to explain the testing and fertilization procedures including the standards used for recommending a given fertilization procedure, the diagnosis or nature of the ailment including whether LCDR Dowling's sperm had low initial motility on July 6, 2012, the probability of success of the contemplated fertilization procedures, and an accurate assessment of the risks associated with such fertilization procedures.

109.    Defendant A.R.T. and its agents, servants, and employees owed a duty to the Dowlings to communicate material and accurate information to enable them to make an intelligent and informed choice, after full and frank disclosure of such information and the benefit of data regarding a proposed course of medical treatment.

110.    The scope of Defendant A.R.T.'s duty to disclose such information was measured by whether such information would have been material to the Dowlings' decision to use a particular fertilization procedure.

111.    Defendant A.R.T., and its agents, servants, and employees owed a duty to the

Dowlings to not substitute its or their employees' judgment for that of the patients in the matter of consent to treatment for a particular fertilization procedure.

112.    LCDR Dowling was in no way contributorily negligent and relied upon the expertise of Defendant A.R.T. to adequately inform him of material information to decide on the appropriate fertilization procedure.

113.    Prior to fertilization, LCDR Dowling was not informed that the statement on the July 6, 2012 Semen Collection and Analysis Form, which indicated that ICSI would be used due to low initial motility, was based on semen samples provided on September 13, 2011 and March 7, 2012.

114.    Prior to fertilization, LCDR Dowling was not informed about the sperm motility thresholds used by Defendant A.R.T. for evaluating semen.

115.    Had LCDR Dowling known that his semen sample provided on July 6, 2012 did not have low initial motility, he would not have signed the July 6, 2012 Semen Collection and Analysis Form indicating or reaffirming his consent to the ICSI procedure.  LCDR Dowling would have exercised his right to withdraw consent to the ICSI procedure.

116.    A reasonable person in the position of LCDR Dowling would not have consented or would have withdrawn consent to proceed with the ICSI fertilization procedure had the following material information been presented prior to fertilization:

(a) Defendant A.R.T.'s semen standards and normal values for judging whether to use IVF or ICSI;

(b) Defendant A.R.T.'s relevant semen standards and normal values are generally higher than the 2010 WHO Semen Manual lower reference ranges;

(c) LCDR Dowling's motility in the semen sample provided on July 6, 2012 (48%), the

day of fertilization, was above Defendant A.R.T.'s normal value for motility (40%);

(d) Defendant A.R.T.'s indication to use ICSI on the July 6, 2012 Semen Collection and Analysis Form was based on the September 13, 2011 and March 7, 2012 semen analysis results instead of the July 6, 2012 semen analysis results;

(e) LCDR Dowling's initial motility measurements on September 13, 2011 (39%), March 7, 2012 (39%), and July 6, 2012 (48%) were all above or within the lower reference range for motility in the 2010 WHO Semen Manual (40(38-42)%);

(f) That as of February 21, 2012, medical literature available at the time indicated that there was a higher incidence of congenital malformations in children born after ICSI with using either regular sperm or epididymal or testicular spermatozoa;

(g) That as of May 10, 2012, the association between IVF and the risk of any birth defect was no longer significant, whereas the increased risk of any birth defect associated with ICSI remained significant;

(h) That as of March 7, 2012, Paxil had been shown to impair fertility and cause significant abnormal DNA fragmentation in sperm;

(i) That as of February 21, 2012, available scientific literature showed that using ICSI with sperm impacted by significant abnormal DNA fragmentation increases the risk for embryological development failure, spontaneous abortion, and birth defects.

(j) Any other material information that may be learned through discovery.

117.    As a direct and proximate result of the failures on the part of Defendant A.R.T. and its agents, servants, and employees to disclose material information and obtain informed consent, LCDR Dowling would not have consented to use ICSI to achieve fertilization on July 6, 2012, and having a compromised embryo transferred into Mrs. Dowling's endometrial cavity

that ultimately led to J.A.D. being born with severe birth defects consistent with pentalogy of Cantrell.

118.    Accordingly, J.A.D.'s severe birth defects consistent with pentalogy of Cantrell could have been prevented.

119.    As a result of J.A.D.'s prenatal diagnosis of pentalogy of Cantrell and his death less than seven months after birth, LCDR Dowling suffered and continues to suffer loss of services and support, injury to and, ultimately, destruction of the parent-child relationship, physical and emotional injury, mental anguish and distress, and loss of society, companionship, comfort, protection, filial care, attention, advice, and counsel.

120.    As a result of the failure to provide informed consent that led to the birth of J.A.D., LCDR Dowling suffered economic damages, which were not compensated by the Dowlings' settlement with the government, including: loss of services and support, costs paid to Defendant A.R.T., medical costs for the University of Washington Medical Center and Seattle Children's Hospital, and his loss of income due to impacts on his career progression and promotion.

## COUNT III

### DEFENDANT A.R.T. - WRONGFUL DEATH:
### VICARIOUS LIABILITY INFORMED CONSENT

121.    Claimant adopts by reference the allegations contained in paragraphs 1 through 120 of this Claim with the same effect as if herein fully set forth.

122.    As a health care provider that had the express purpose of artificially conceiving a child for the Dowlings, Defendant A.R.T. and its agents, servants, or employees owed a duty to J.A.D., as an intended beneficiary to provide the Dowlings with medical care consistent with the governing standards for providing informed consent.

28

123.     Maryland law recognizes the possibility of imposing a duty of care in the absence of a doctor-patient relationship to a third party who never received treatment from the doctor. Defendant A.R.T.'s duty to J.A.D. is apparent because J.A.D. received treatment from Defendant A.R.T. in the form of a pipette being inserted into Mrs. Dowling's oocyte to create an embryo.

124.     Defendant A.R.T. and its agents, servants, and employees owed a duty to J.A.D. as the intended beneficiary of the information that should have been presented to his parents, the Dowlings, to explain the testing and fertilization procedures including the standards used for recommending a given fertilization procedure, the diagnosis or nature of the ailment including whether LCDR Dowling's sperm had low initial motility on July 6, 2012, the probability of success of the contemplated fertilization procedures, and an accurate assessment of the risks associated with such fertilization procedures.

125.     Defendant A.R.T. and its agents, servants, and employees owed a duty to J.A.D. as the intended beneficiary of the information that should have been presented to his parents, the Dowlings, to communicate material and accurate information to enable his parents to make an intelligent and informed choice, after full and frank disclosure of such information and the benefit of data regarding a proposed course of medical treatment.

126.     Once Defendant A.R.T.'s employee injected the pipette into Mrs. Dowlings oocyte during the ICSI fertilization procedure, J.A.D. was an entity later born alive who was then presently being impacted during his prenatal life by Defendant A.R.T.'s failure to provide informed consent to use ICSI.

127.     J.A.D. would have been able to maintain an action against Defendant A.R.T. because Maryland law recognizes (1) that if a child born after an injury or impact sustained at any period of its prenatal life can prove the effect on it of a tort, it would have a right to recover,

and (2) that from the moment of conception, the fetus or embryo is not a part of the mother, but rather has a separate existence.

128. As a direct and proximate result of the failures on the part of Defendant A.R.T. and its agents, servants, and employees to disclose material information and to obtain informed consent, LCDR Dowling would not have consented to use ICSI to achieve fertilization on July 6, 2012, and having a compromised embryo transferred into Mrs. Dowling's endometrial cavity that ultimately led to J.A.D. being born with severe birth defects consistent with pentalogy of Cantrell.

129. As a result of J.A.D.'s prenatal diagnosis of pentalogy of Cantrell and his death less than seven months after birth, LCDR Dowling suffered and continues to suffer loss of services and support, injury to and, ultimately, destruction of the parent-child relationship, physical and emotional injury, mental anguish and distress, and loss of society, companionship, comfort, protection, filial care, attention, advice, and counsel.

130. As a result of the failure to provide informed consent that led to the birth of J.A.D., LCDR Dowling suffered economic damages, which were not compensated by the Dowlings' settlement with the government, including: loss of services and support, costs paid to Defendant A.R.T., medical costs for the University of Washington Medical Center and Seattle Children's Hospital, and his loss of income due to impacts on his career progression and promotion.

## COUNT IV

### DEFENDANT A.R.T. - SURVIVAL ACTION:
### VICARIOUS LIABILITY INFORMED CONSENT

131. Plaintiff adopts by reference the allegations contained in paragraphs 1 through 130 of this Claim with the same effect as if herein fully set forth.

132.     As a health care provider that had the express purpose of artificially conceiving a child for the Dowlings, Defendant A.R.T. and its agents, servants, or employees owed a duty to J.A.D., as an intended beneficiary to provide the Dowlings with medical care consistent with the governing standards for providing informed consent.

133.     Maryland law recognizes the possibility of imposing a duty of care in the absence of a doctor-patient relationship to a third party who never received treatment from the doctor. Defendant A.R.T.'s duty to J.A.D. is apparent because J.A.D. received treatment from Defendant A.R.T. in the form of a pipette being inserted into Mrs. Dowling's oocyte to create an embryo.

134.     Defendant A.R.T. and its agents, servants, and employees owed a duty to J.A.D. as the intended beneficiary of the information that should have been presented to his parents, the Dowlings, to explain the testing and fertilization procedures including the standards used for recommending a given fertilization procedure, the diagnosis or nature of the ailment including whether LCDR Dowling's sperm had low initial motility on July 6, 2012, the probability of success of the contemplated fertilization procedures, and an accurate assessment of the risks associated with such fertilization procedures.

135.     Defendant A.R.T. and its agents, servants, and employees owed a duty to J.A.D. as the intended beneficiary of the information that should have been presented to his parents, the Dowlings, to communicate material and accurate information to enable his parents to make an intelligent and informed choice, after full and frank disclosure of such information and the benefit of data regarding a proposed course of medical treatment.

136.     Once Defendant A.R.T.'s employee injected the pipette into Mrs. Dowlings oocyte during the ICSI fertilization procedure, J.A.D. was an entity later born alive who was then presently being impacted during his prenatal life by Defendant A.R.T.'s failure to provide

31

informed consent to use ICSI.

137.    J.A.D. would have been able to maintain an action against Defendant A.R.T. because Maryland law recognizes (1) that if a child born after an injury or impact sustained at any period of its prenatal life can prove the effect on it of a tort, it would have a right to recover, and (2) that from the moment of conception, the fetus or embryo is not a part of the mother, but rather has a separate existence.

138.    As a direct and proximate result of the failures on the part of Defendant A.R.T. and its agents, servants, and employees to disclose material information and to obtain informed consent, LCDR Dowling would not have consented to use ICSI to achieve fertilization on July 6, 2012, and having a compromised embryo transferred into Mrs. Dowling's endometrial cavity that ultimately led to J.A.D. being born with severe birth defects consistent with pentalogy of Cantrell.

139.    From his birth until his death, J.A.D. suffered physical pain, mental anguish, and emotional distress as a result of being born with severe birth defects that required multiple medical procedures.  These birth defects ultimately led to J.A.D.'s painful death.

**COUNT V**

DEFENDANT CULLINGFORD – NEGLIGENT MISREPRESENTATION

140.    Plaintiff LCDR Dowling adopts by reference the allegations contained in paragraphs 1 through 139 of this Complaint with the same effect as if herein fully set forth.

141.    Defendant Cullingford, an employee of Defendant A.R.T., had a duty of care to LCDR Dowling.  This duty required Defendant Cullingford to adequately and accurately describe the results of the semen analysis on the July 6, 2012 Semen Collection and Analysis Form to LCDR Dowling.

142.    The misrepresentations by Defendant Cullingford, made on behalf of the Defendant A.R.T., to LCDR Dowling concerning his semen sample on July 6, 2012 constitute misrepresentations of fact and concealment of facts (e.g., "The sample that has been prepared is of <u>ICSI</u> standards. […] ICSI (if applicable) due to: <u>Low Initial Motility</u>").

143.    Defendant Cullingford based her representations on the semen sample provided on March 7, 2012, and did not inform LCDR Dowling that a prewash motility result of 48% meant that his sperm was above the threshold for low initial motility on July 6, 2012.

144.    Defendant Cullingford knew her misrepresentations were false and/or incomplete when she made them.

145.    Defendant Cullingford knew the facts but used words or other communicative devices poorly; or unreasonably failed to make statements at all, or failed to clarify the Plaintiff's understanding concerning the July 6, 2012 Semen Collection and Analysis Form.

146.    Defendant Cullingford was negligent in the assertion of these misrepresentations.

147.    Defendant Cullingford's misrepresentations were made with the intention of LCDR Dowling relying upon such representations.

148.    Defendant Cullingford knew that LCDR Dowling would rely upon and was, in fact, relying upon her misrepresentations and that LCDR Dowling would incur damage.

149.    LCDR Dowling's decision to proceed with ICSI to achieve fertilization instead of IVF was made in reliance upon Defendant Cullingford's misrepresentations, and LCDR Dowling was justified in his reliance because she was an employee of Defendant A.R.T.

150.    As a direct and proximate result of Defendant Cullingford's misrepresentations, the Dowlings used ICSI to achieve fertilization on July 6, 2012, which deprived LCDR Dowling of the right to exercise informed consent, of the relative benefits and decreased risks of IVF in

comparison to ICSI, and of the costs associated with the fertilization procedure.

151.     As a direct and proximate result of Defendant Cullingford's misrepresentations, LCDR Dowling consented to use ICSI to achieve fertilization on July 6, 2012, and had a compromised embryo transferred into Mrs. Dowling's endometrial cavity that ultimately led to J.A.D. being born with severe birth defects consistent with pentalogy of Cantrell.

152.     As a result of J.A.D.'s prenatal diagnosis of pentalogy of Cantrell and his death less than seven months after birth, LCDR Dowling suffered and continues to suffer loss of services and support, injury to and, ultimately, destruction of the parent-child relationship, physical and emotional injury, mental anguish and distress, and loss of society, companionship, comfort, protection, filial care, attention, advice, and counsel.

153.     As a result of Defendant Cullingford's misrepresentations, LCDR Dowling suffered economic damages, which were not compensated by the Dowlings' settlement with the government, including: loss of services and support, costs paid to Defendant A.R.T., medical costs for the University of Washington Medical Center and Seattle Children's Hospital, and his loss of income due to impacts on his career progression and promotion.

**COUNT VI**

DEFENDANT A.R.T. – VICARIOUS LIABILITY (ERIKA CULLINGFORD)
NEGLIGENT MISREPRESENTATION

154.     Plaintiff LCDR Dowling adopts by reference the allegations contained in paragraphs 1 through 153 of this Complaint with the same effect as if herein fully set forth.

155.     Defendant A.R.T. is vicariously liable for the negligent misrepresentations made by Defendant Cullingford on July 6, 2012.

156.     Defendant A.R.T. is vicariously liable for the damages proximately caused by Defendant Cullingford.

34

## COUNT VII

### DEFENDANT CULLINGFORD – CONSTRUCTIVE FRAUD

157.   Plaintiff LCDR Dowling adopts by reference the allegations contained in paragraphs 1 through 156 of this Complaint with the same effect as if herein fully set forth.

158.   Defendant Cullingford owed a legal duty, under the informed consent doctrine and the 2012 Government Contract, to LCDR Dowling to accurately and adequately provide material information concerning the results of the July 6, 2012 Semen Collection and Analysis Form.

159.   Defendant Cullingford breached that duty by knowingly failing to accurately and adequately provide material information concerning the results of the July 6, 2012 Semen Collection and Analysis Form.

160.   Defendant Cullingford's violation of her duty to LCDR Dowling was done intentionally and with reckless disregard to the truth, LCDR Dowling's right to informed consent, to the health and well-being of the child that he was trying to conceive with Mrs. Dowling, and the public's interest in protecting life and ensuring medical providers obtain informed consent when conceiving a child.

161.   As a direct and proximate result of Defendant Cullingford's breach of duty to LCDR Dowling, LCDR Dowling consented to use ICSI to achieve fertilization on July 6, 2012, which deprived LCDR Dowling of the right to exercise informed consent, of the relative benefits and decreased risks of IVF in comparison to ICSI, and of the costs associated with the fertilization procedure.

162.   As a direct and proximate result of Erika Cullingford's breach of duty to LCDR Dowling, LCDR Dowling consented to use ICSI to achieve fertilization on July 6, 2012, and had

a compromised embryo transferred into Mrs. Dowling's endometrial cavity that ultimately led to J.A.D. being born with severe birth defects consistent with pentalogy of Cantrell.

163.    As a result of J.A.D.'s prenatal diagnosis of pentalogy of Cantrell and his death less than seven months after birth, LCDR Dowling suffered and continues to suffer loss of services and support, injury to and, ultimately, destruction of the parent-child relationship, physical and emotional injury, mental anguish and distress, and loss of society, companionship, comfort, protection, filial care, attention, advice, and counsel.

164.    As a result of Defendant Cullingford's misrepresentations, LCDR Dowling suffered economic damages, which were not compensated by the Dowlings' settlement with the government, including: loss of services and support, costs paid to Defendant A.R.T., medical costs for the University of Washington Medical Center and Seattle Children's Hospital, and his loss of income due to impacts on his career progression and promotion.

**COUNT VIII**

DEFENDANT A.R.T. – VICARIOUS LIABILITY (ERIKA CULLINGFORD)
CONSTRUCTIVE FRAUD

165.    Plaintiff LCDR Dowling adopts by reference the allegations contained in paragraphs 1 through 164 of this Complaint with the same effect as if herein fully set forth.

166.    Defendant A.R.T. is vicariously liable for the actions and omissions of Defendant Cullingford on July 6, 2012.

167.    Defendant A.R.T. is vicariously liable for the damages proximately caused by Defendant Cullingford.

**DEMAND FOR JURY TRIAL**

168.    Plaintiff demands trial by jury for Counts II through VIII, and respectfully requests an expedited hearing or summary judgment for Count I.

## PRAYER FOR RELIEF

WHEREFORE, I, Plaintiff LCDR Dowling, pray this Court enter judgement in my favor and against Defendant A.R.T. and Defendant Cullingford, consisting of:

(a) judgement for the declaratory relief sought in Count I;

(b) judgement against Defendant A.R.T. and Defendant Cullingford in the amount of $3,000,000 (THREE MILLION DOLLARS);

(c) judgement awarding my costs in this action;

(d) injunctive relief requiring Defendant A.R.T to notify its patients about (1) the parameters and values it uses for judging the adequacy of sperm to achieve fertilization, (2) the normal semen values found in the 2010 WHO Semen Manual, and (3) the risks of using ICSI with sperm impacted by abnormal DNA fragmentation and the medications, specifically Selective Serotonin Reuptake Inhibitors (SSRIs), that may cause such abnormal DNA fragmentation; and

(e) other relief to which I may be entitled as a matter of law or equity, including nominal and punitive damages if applicable, or which the Court determines to be just and proper.

Respectfully Submitted,

JONATHAN E. DOWLING
ESTATE OF J.A.D.

By:

Jonathan E. Dowling
Pro Se, Individually and on behalf of the Estate of J.A.D.
443-610-3795
6612 Thurlton Drive
Alexandria, VA 22315