IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JONATHAN E. DOWLING, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. PX-18-0117 |
| A.R.T. INSTITUTE OF WASHINGTON, INC., *et al.* | * | |
| Defendants. | * | |

\*\*\*\*\*\*

**MEMORANDUM OPINION**

This case concerns the heartbreak of infertility compounded by the suffering of an infant born with a severe congenital disorder. In filing this suit, Plaintiff Jonathan Dowling lays bare his family's difficult journey. Dowling asserts that the embryology practice where Dowling and his wife sought assistance caused the couple unwittingly to agree to a high-tech in-vitro fertilization procedure which, in their view, led to their infant son's severe and ultimately fatal birth defects. Before this opinion unfolds, it is important to recognize the depth of the Dowlings' suffering and loss.

Now the Court must review the Complaint for legal sufficiency. Defendants A.R.T. Institute of Washington, Inc. and Erika Cullingford (collectively, "Defendants") have moved to dismiss the Complaint or in the alternative for summary judgment. ECF No. 7. Dowling has opposed the motion and moves for partial summary judgment in his favor. ECF No. 21. The Court held a hearing on February 25, 2019. For the following reasons, the Court denies Defendants' motion and grants Dowling's motion in part.

## I.    Background

Jonathan Dowling ("Dowling") is a Lieutenant Commander in the Judge Advocate

General's Corps of the United States Navy.  ECF No. 1 at 2.  For quite some time, he and his

wife Kathryn had wanted a baby, and tried a variety of fertility treatments to no avail.  *Id.* ¶ 18.

At some point, the couple chose to pursue in vitro fertilization ("IVF") at the Walter Reed

National Military Medical Center ("WRNMMC") in Bethesda, Maryland.  *Id.*  WRNMMC

contracted with the A.R.T. Institute of Washington, Inc ("A.R.T.") to provide embryology

services to military servicemembers and their families.  *Id.* ¶¶ 14, 19–20.

In pursuit of IVF, the Dowlings met with medical staff from WRNMMC and A.R.T. on

February 21, 2012.  *Id.* ¶ 36.  At this meeting, the Dowlings signed a written consent form

pertaining to IVF generally and to a specific type of embryological service called

intracytoplasmic sperm injection ("ICSI").  *Id.* ¶ 37.  ICSI is a procedure where trained medical

personnel identify from the male partner's sperm sample a single sperm that provides the best

opportunity for fertilization, and then injects that single sperm via a pipette directly into the egg.

ECF No. 1-6 at 6.  ICSI is often used when "the sperm may not be judged adequate to achieve

fertilization using conventional insemination (putting the eggs and sperm closely together)."  *Id.*

At the initial meeting with the Dowlings, A.R.T. presented the ICSI consent form for

their review and signatures.  The form memorialized that the Dowlings understood how ICSI

worked, in that prior to an IVF-ICSI cycle, Dowling would provide a semen sample "for analysis

by the andrology laboratory."  *Id.* at 1.  If the sample was "not judged adequate to achieve

fertilization using conventional insemination" or "where fertilization has failed or was

substantially reduced in prior IVF cycles," ICSI would offer a better chance of conceiving. *Id.* at 6.

As part of the ICSI consent form, the Dowlings were apprised of several risks and precautions. Specifically, under a prominent heading in boldface type which read "**We understand that ICSI may involve the following risks or disadvantages,**" the consent form expressly warned that "[t]his technology is relatively new (started 1992), and there may be unknown risks to the baby or mother." ECF No. 1-6 at 6–7. The consent further warned that "[w]hile there seems to be no higher overall incidence of congenital malformations in children born after ICSI . . . the risk cannot be totally ruled out." *Id.* at 7. The consent form confirmed that the Dowlings knew and understood all the terms: "We hereby attest that we have read the above referenced consent forms, or that they have been read to us, so that we understand it completely. We further attest that any and all questions of ours regarding all procedures have been answered to our complete satisfaction." *Id.* at 12.

On March 7, 2012, Dowling provided a semen sample for evaluation to A.R.T. junior embryologist Erika Cullingford ("Cullingford"). ECF No. 1 ¶¶ 28, 47. Dowling noted on the accompanying Semen Analysis Form that he had begun taking paroxetine, commonly known as Paxil, that same day. *Id.* ¶¶ 46–47. Cullingford and another A.R.T. employee analyzed his sample and found the sperm's "pre-wash motility" to be 39%, with the "normal value" noted as >40%. *Id.* ¶ 47; ECF No. 1-9. The form also noted a finding of "ICSI Low initial motility." ECF No. 1-9.

The Dowlings then began their IVF procedure, which included Kathryn Dowling taking hormone stimulants to promote maturation of several eggs at once. Prior to beginning this phase of the IVF process, A.R.T. invoiced the Dowlings for their upcoming IVF cycle, which included

a separate charge for ICSI.  ECF No. 1 ¶¶ 31, 48.  When Kathryn Dowling asked A.R.T. about

the charge for ICSI, she was told that the "low initial motility" finding from the March 7, 2012

sperm sample warranted the use of ICSI.  *Id.* ¶ 48.  The Dowlings paid the invoice in full.  *Id.* ¶

49.

On July 6, 2012, the Dowlings returned to WRNMMC for the clinic to retrieve Kathryn

Dowling's eggs and collect another semen sample from Dowling for fertilization via ICSI.  *Id.*  ¶

53.  Before this day, Dowling had researched the effects of Paxil on conception.  Specifically,

Dowling had read that using Paxil may lead to increased DNA fragmentation in sperm that could

complicate pregnancy and risk abnormalities in the fetus.  *Id.* ¶ 51.  Dowling shared these

concerns with the WRNMMC medical providers who responded that the risk of Dowling's

recent Paxil use was "negligible" in terms of fertilization.  *Id.* ¶¶ 51, 54.  Dowling again filled

out the A.R.T. Semen Analysis Form, noting that he was taking Paxil and that "Doctor did not

provide information on impacts on sperm.  Discovered study last night on internet."  *Id.* ¶ 55.

According to the study Dowling had found, the likely DNA fragmentation in his sperm in July

2012 was 42%, well above the 30% threshold for abnormal DNA fragmentation.  *Id.* ¶ 70.  In

contrast, when Dowling underwent semen analysis in February 2013, after discontinuing Paxil in

October 2012, his DNA fragmentation level was 26%.  *Id.* ¶ 69.  In other words, an abnormally

high percentage of the sperm sample used for ICSI included damaged sperm attributable to using

Paxil.

The Dowlings proceeded with egg retrieval and fertilization.  Dowling provided a sperm

sample which Cullingford analyzed as having a "prewash motility of 48%" and a "prewash

progression of 40%."  *Id.* ¶ 56.  Cullingford noted on the Semen Analysis Form that "[t]he

sample that has been prepared is of ICSI standards . . . due to [l]ow initial motility."  *Id.*

Dowling reviewed this form prior to agreement to use ICSI for fertilization. He understood Cullingford's note to mean that the sample he had given that day (July 6, 2012) had low motility. Consequently, he and his wife consented to the ICSI procedure. *Id.* ¶ 57.

A.R.T. selected twelve individual sperm cells to fertilize twelve eggs retrieved from Kathryn Dowling. *Id.* ¶ 58. On July 11, 2012, an embryo was transferred to Kathryn Dowling. *Id.* ¶ 59. Several days later, the Dowlings learned they were pregnant. *Id.* ¶ 61.

In Kathryn's six month of pregnancy, doctors diagnosed the fetus with a rare disorder called pentalogy of Cantrell. *Id.* ¶ 63. The disorder spans a broad spectrum of severity and may involve major defects to five areas of the body: the sternum, heart, pericardium (heart lining), diaphragm, and abdominal wall. *Id.*; ECF No. 1-11 at 3. Although the exact prevalence is not fully known, an estimated 5.5 of every 1 million babies suffer from pentalogy of Cantrell of varying severity. ECF No. 1-11 at 3.

When J.A.D. was born, doctors determined that J.A.D. suffered from a particularly severe case of the disorder. ECF No. 1 ¶ 73; ECF No. 1-11 at 4–5. Among other life-saving measures, J.A.D. underwent open-heart surgery, chest closure surgery, and three catheter procedures. ECF No. 1 ¶ 76. In total, J.A.D. spent roughly half his young life in the hospital. *Id.* On October 26, 2013, J.A.D. died as a result, at home and in his parents' arms. *Id.* ¶ 78.

After losing J.A.D., the Dowlings filed suit in the United States District Court for the District of Washington on behalf of themselves and J.A.D.'s estate against the WRNMMC physicians and Washington state military medical personnel pursuant to the Federal Tort Claims Act ("FTCA").[1] ECF No. 1-12; ECF No. 1 ¶ 87 ("Washington case"). In the Washington case, the Dowlings asserted claims for lack of informed consent, wrongful death and survivorship

---

[1] During Kathryn Dowling's pregnancy, the Dowlings were relocated on military orders to Washington state, where J.A.D. was born. ECF No. 7-8 ¶¶ 51, 102.

based on WRNMMC's participation in the consent and fertilization process. The Washington Complaint also included medical negligence claims against the military physicians who failed to diagnose J.A.D.'s pentalogy of Cantrell in a timely manner. The Washington Complaint, however, did not name A.R.T. or Cullingford as defendants, but rather described them as "independent contractor[s]" that provided embryology services to the military medical personnel at WRNMMC. ECF No. 7-8 ¶ 15. The Washington Complaint also alleged that WRNMMC and A.R.T. medical personnel played various roles in obtaining consent from the Dowlings to undergo IVF-ICSI. *See, e.g.*, *id.* ¶¶ 15–17 (describing an IVF orientation administered by A.R.T. where the Dowlings signed consent forms)*; see also id.* ¶ 42 (Dowling signed consent forms for semen collection and analysis for IVF/ICSI on July 6, 2012 wherein he noted concern about Paxil damaging sperm).

In June of 2016, the Dowlings executed a settlement and release with the United States (the "Settlement Agreement"). ECF No. 7-2. The Settlement Agreement expressly states that

> The parties [the Dowlings and the United States] do hereby agree to settle and compromise each and every claim of any kind, against all persons, in their individual or official capacities, and **against the United States of America and all of its agencies**, whether known or unknown, arising directly or indirectly, from the acts or omissions that gave rise to the above-captioned action under the terms and conditions set forth in this Stipulation for Compromise Settlement and Release.

*Id.* ¶ 1 (emphasis added). The Settlement Agreement further provides that

> The **United States of America** agrees to pay the sum of [REDACTED] . . . which sum shall be in full settlement and satisfaction of any and all claims, demands, rights and causes of action of whatsoever kind and nature, arising from, and by reason of, any and all known and unknown, foreseen and unforeseen bodily and personal injuries, damage to property and the consequences thereof, resulting, and to result, from the subject matter of this settlement, including any claims for wrongful death, for which Plaintiffs or their guardians, heirs, executors, administrators, or

assigns, and each of them, now have or may have hereafter acquire **against the United States of America, its agents, servants and employees**.

*Id.* ¶ 2 (emphasis added). The agreement finally contemplates possible future litigation against parties not involved in the Washington case, stating

> Plaintiffs . . . further agree to reimburse, indemnify and hold harmless the United States of America, its agents, servants, and employees from and against any and all such causes of action, claims, liens, rights, or subrogated or contribution interests incident to or resulting from **further litigation or the prosecution of claims by the plaintiff . . . against any third party or against the United States, including claims for wrongful death.**

*Id.* ¶ 3 (emphasis added). The United States and Dowling consummated this agreement, and the Washington case was dismissed. ECF No. 7-9.

On January 12, 2018, Dowling, individually and as the personal representative of the estate of J.A.D. and to the use of Kathryn Dowling, brought suit against A.R.T. and Cullingford asserting largely, but not wholly, similar claims to those raised in the Washington case. ECF No. 1. Dowling brings suit on his own behalf for failure to provide Dowling adequate informed consent, as well as wrongful death and survivorship claims premised on the same consent failures. The Complaint also pleads negligent misrepresentation against Cullingford for misreporting the results of Dowling's semen analysis and constructive fraud as to both Defendants. Dowling further asks this Court to declare that the Settlement Agreement does not completely bar this suit proceeding against A.R.T. and Cullingford.

Defendants contend that dismissal of the Complaint is warranted on several grounds, to include that the Settlement Agreement reaches these claims and parties; that the Washington doctors' negligence in failing to diagnose J.A.D.'s disease sooner constitutes an intervening cause that bars relief; and that the informed consent claims must fail as a matter of law. ECF No.

7.  Dowling has cross-moved for partial summary judgment regarding whether the FTCA bars

this suit.  ECF No. 21.

## II.      Standard of Review

Although the parties urge this Court to review this case under a summary judgment

standard, the Court notes that the Complaint incorporates by reference the documents necessary

for the Court to treat the Defendants motion as one to dismiss under Rule 12(b)(6).  *Goines v.*

*Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  Because no formal discovery has

taken place, the Court reviews Defendants' motion under Rule 12(b)(6).

A motion to dismiss is designed to test the sufficiency of the complaint.  *Presley v. City*

*of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  The Court accepts "the well-pled

allegations of the complaint as true," and construes all facts and reasonable inferences most

favorably to the plaintiff.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  To

survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to

relief above the speculative level on the assumption that all the allegations in the complaint are

true (even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (internal citations omitted).

## III.     Analysis

### A.  The FTCA Settlement

Defendants contend that Dowling cannot pursue claims against them because the

Settlement Agreement constitutes full satisfaction for all claims against all parties arising out of

the informed consent procedure for ICSI, and that to allow the claim to proceed would permit the

Dowlings to double recover. For the following reasons, the Court disagrees that the Settlement Agreement bars suit.

An FTCA action is brought against the United States for claims involving government actors who would otherwise enjoy immunity from suit. 28 U.S.C. § 1346; *see also United States v. Orleans*, 425 U.S. 807, 813 (1976) (The FTCA constitutes a "limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."), *abrogated on other grounds by United States v. Olson*, 546 U.S. 43 (2005). Most relevant to this case, "[t]he FTCA explicitly *excludes* independent contractors from its scope." *In re KBR, Inc*., 736 F. Supp. 2d 954, 963–64 (D. Md. 2010), *modified on reh'g sub nom. In re KBR, Inc., Burn Pit Litig*., 925 F. Supp. 2d 752 (D. Md. 2013), *vacated on other grounds and remanded*, 744 F.3d 326 (4th Cir. 2014); *see also Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996) (affirming the dismissal of FTCA claims against physicians who were independent contractors on an Air Force base because "Congress has not waived the sovereign immunity of the United States for injuries resulting from the actions of independent contractors performing work for the government"). Thus, the Washington case brought pursuant to the FTCA does not on its face include as defendants A.R.T. and Cullingford, the independent contractors. ECF No. 7-2 ¶ 4 ("This settlement is entered into by all parties for the purpose of compromising disputed claims under the Federal Tort Claims Act . . . .").

Further, the Settlement Agreement plainly contemplated full satisfaction for claims "against all persons, in their *individual or official capacities*, and against the United States of America and all of its agencies, whether known or unknown, arising directly or indirectly from the acts or omissions that gave rise to the above-captioned action . . . ." ECF No. 1-13 at ¶ 1

(emphasis added). *See also* 28 U.S.C. § 2677 ("The Attorney General or his designee may arbitrate, compromise, or settle any claim cognizable under section 1346(b) of this title."). Private actors such as A.R.T. and Cullingford do not act in "official" as opposed to "individual" capacities, terms of art used in the context of state action. *See, e.g., Hafer v. Melo*, 502 U.S. 21, 25 (1991) (explaining that "the real party in interest in an official-capacity suit is the governmental entity and not the named official," while "[p]ersonal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law"). The Settlement Agreement plainly does not cover claims brought against A.R.T. and Cullingford.

Defendants more particularly argue that the Settlement Agreement fully satisfies the Dowlings for all claims arising from the very causes of action brought in this case. Consequently, say Defendants, allowing this case to go forward would be futile because even if the Dowlings obtained a judgment against A.R.T. or Cullingford, Maryland's "one satisfaction" rule bars receiving any further monetary award. The Defendants overplay the relevance of the one satisfaction rule to this matter.

The one satisfaction rule is grounded in "the general principle that a plaintiff is entitled to but one compensation for her loss and that satisfaction of her claim prevents further action against another for the same damages." *Underwood-Gary v. Mathews*, 366 Md. 660, 667 (2001)*; see also Welsh v. Gerber Prod., Inc*., 315 Md. 510, 524 (1989) ("[I]t is neither just nor lawful that there should be more than one satisfaction for the same injury, whether that injury be done by one or more."). "It is ordinarily a question of fact whether the judgment in the first action encompassed *all* the injuries sustained by the plaintiff." *Underwood-Gary,* 366 Md. at 672.

The Court is at a loss for how the one satisfaction rule would ever bar recovery here. This is because the action, as pleaded in both the Washington case and this Complaint, renders the Government actors and A.R.T. Defendants joint tortfeasors. Under Maryland law, joint tortfeasors are "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Md. Code Ann. Cts. & Jud. Proc. § 3-1401. Put differently, when reading the Complaint most favorably to Dowling, WRNMMC, A.R.T. and Cullingford participated in the same consent process which Dowling now asserts was negligently conducted. In that respect, the WRNMMC physicians and Defendants in this case are, together, responsible for the consent process and so, together, are joint tortfeasors.

Importantly, under Maryland's iteration of the Uniform Contributions Among Tort-Feasors Act, settling against one joint tortfeasor does not, by operation of law, settle against all. *See id.* § 3-1404 ("A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides . . . ."). However, a settlement with one tortfeasor "reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid." *Id.* Consequently, the Settlement Agreement in the Washington case, at worst, may reduce any eventual award. It cannot bar the litigation from proceeding in the first instance.[2]

Defendants vigorously argue that the joint tortfeasor analysis is beside the point because the Settlement Agreement constituted full satisfaction for all claims. In this sense, the Dowlings have been "made whole for identical injury/damages claims," and so any recovery is barred by

---

[2] Should this case proceed to a juncture at which the Court allows amendment of pleadings, the Court notes that alternate claims such as breach of contract are not subject to the joint tortfeasor rule.

the one satisfaction rule.  ECF No. 7-1 at 15; *cf. Gallagher v. Mercy Med. Ctr., Inc.,* No. 634,

2018 WL 3199260, at *4 (Md. App. June 28, 2018), *cert. granted sub nom. Gallagher v. Mercy*

*Med. Ctr.,* 461 Md. 482 (2018).  However, the plain language of the Settlement Agreement

cannot be read to cover all claims for all time arising out of the Dowlings' consent and

fertilization process.  In fact, the Agreement plainly limits the recovery to all claims *as to the*

*United States*.

Further, to read the Agreement as Defendants suggest would render useless the provision

requiring Plaintiff to indemnify or hold harmless the United States for any downstream

"contribution interests incident to or **resulting from further litigation or the prosecution of**

**claims by the plaintiff . . . against any third party** or against the United States, including

claims for wrongful death."  ECF No. 7-2 ¶ 3 (emphasis added).  Indeed, if the Settlement

Agreement were to have accorded full satisfaction for all claims arising from the consent and

fertilization process, including those against a "third party" (A.R.T. or Cullingford), then the

parties would have no need for this provision.  But the United States and the Dowlings, evidently

in recognition that future litigation may arise, negotiated accordingly.  The Court cannot credit

Defendants' argument when its logical extension would render this negotiated term superfluous. [3]

_____

[3] Dowling urges the Court to find that because the *Feres* doctrine renders the Government immune from
suit on the Maryland causes of action pleaded in this case, the Settlement Agreement, by extension, only
extinguished the claims brought against the Washington state medical military staff who failed to diagnose J.A.D.
with pentalogy of Cantrell in a timely manner.  *See* ECF No. 1-12 (administrative denial of the Dowlings' FTCA
personal injury and wrongful death claims as barred by the *Feres* doctrine).  In *Feres v. United States,* the Supreme
Court held that a serviceman may not recover for negligence claims "against either his superior officers or the
Government he is serving."  340 U.S. 135, 141 (1950) (footnote omitted).  The Fourth Circuit has since extended
what has become known as the "*Feres* doctrine" to family members of servicemen where the negligence of military
personnel as to the serviceman was also the "genesis" and "but for" cause of the injuries to the family members.  *See*
*Minns v. United States,* 155 F.3d 445, 450 (4th Cir. 1998).  Dowling contends that the Government had taken the
position that *Feres* bars suit as to the military personnel regarding the informed consent claims because Dowling had
been prescribed Paxil by military physicians during military service.  Accordingly, argues Dowling, if the
Government is immune from suit on the informed consent claims, it cannot be a joint tortfeasor.  Although this
argument may, in the end, be correct, the Court cannot decide this issue now.  No liability finding against
Defendants is before the Court, so any determination as to potential satisfaction stemming from such theoretic
liability amounts to an improper advisory opinion.  Additionally, the precise contours of *Feres'* application to this

## B. Intervening or Superseding Cause

Defendants next argue that the claims cannot proceed because the Washington state medical providers' failure to diagnose J.A.D.'s condition early enough so that the pregnancy could be terminated constitutes a superseding cause that precludes recovery against Defendants. ECF No. 7-1 at 15. In support of this contention, the Defendants primarily rely on the Dowlings' averments in the Washington Complaint. ECF No. 7-8 ¶¶ 155–182. "[I]n the absence of the government radiologists' negligence," say Defendants, "all of the damages in this case (which stem entirely from the birth and death of J.A.D.) would have been avoided."[4] ECF No. 25 at 9. This argument, while intuitively appealing, is premature.

The doctrine of intervening or superseding cause bars recovery for a defendant's initial negligent acts where the intervening acts sever the causal connection between the defendant's wrongdoing and the plaintiff's injuries. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 157 (1994). "[A] superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Pittway Corp. v. Collins,* 409 Md. 218, 249 (2009) (citing Restatement (Second) of Torts, §§ 442, 447); *see also Yonce v. SmithKline Beecham Clinical Labs., Inc.*, 111 Md. App. 124, 140 (1996) ("An intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence.").

The Court is not prepared to credit at this stage that the Washington physicians' failure to timely diagnose J.A.D.'s condition bars recovery against Defendants. This determination is

---

case will require additional factual development. Nothing in the Settlement Agreement assists the Court in this respect. Accordingly, the Court must leave *Feres*' impact on this case, if any, for another day.

[4] Defendants initially pointed to the clinical decision of the military medical provider at WRNMMC to proceed with ICSI as another intervening cause (ECF No. 7-1 at 16–17) but narrowed their argument in reply. ECF No. 25 at 8–9.

inherently fact-specific and best left for the jury. *See, e.g.*, *Copsey v. Park*, 228 Md. App. 107, 121 (2014) (allowing evidence of possible negligence of subsequent treating physicians to avoid misleading jury regarding scope of initial treating physician's negligence). The Court, more particularly, notes that the gravamen of this Complaint depends on the foreseeability of congenital defects arising from ICSI and the Defendants' failure to advise the Dowlings of such risks. Accordingly, at this stage in the proceedings, the Court cannot find as a matter of law that the subsequent failure to diagnose J.A.D.'s birth defects during the prenatal screenings is so extraordinary and unforeseeable as to require dismissal. *See Yonce*, 111 Md. App. at 147. Defendants may revisit this contention, if they choose, on summary judgment.

In sum, neither the Washington Settlement Agreement nor the intervening cause doctrine bars suit. Rather, if Defendants are found liable, any possible adjustments to a damage award may be determined in an appropriate contribution action.[5] Defendants' motion is denied on these grounds.

### C. Legal Sufficiency of Consent Claims

Dowling brings three causes of action based on a failure to provide informed consent. Undergirding these claims, Dowling avers two main failures in the informed consent process. First, that Defendants failed to inform him of the sperm motility measures used for selecting ICSI, or that his sperm motility measurement on July 6, 2012, the day of fertilization, was above A.R.T.'s threshold for ICSI. Dowling contends that had he known the July 6 sample was above threshold, even only by a few percentage points, the Dowlings would not have chosen ICSI.

---

[5] For the same reasons given, Dowling's motion for summary judgment (ECF No. 21) as to his requested declaratory relief—that the prior settlement agreement does not bar this action against A.R.T. and Cullingford—is granted. Although the Court reviews Defendants' motion as one to dismiss, Dowling's narrowly crafted request for declaratory relief may be decided on summary judgment. When viewing the Settlement Agreement's unambiguous terms most favorably to Defendants, no reading of the Settlement Agreement bars suit against them as a matter of law. Fed. R. Civ. P. 56(a); *see also In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). On this narrow question for which no additional factual development is necessary, summary judgment is granted.

ECF No. 1 ¶¶ 113–115.  Second, Dowling contends that Defendants failed to warn the Dowings

about the known medical risk of birth defects associated with ICSI.  Based on these alleged

failures, Dowling brings a claim on behalf of himself (Count II), on behalf of himself and his

wife as use plaintiff for wrongful death of J.A.D (Count III), and a survivorship claim on behalf

of J.A.D.'s estate (Count IV).  The Court addresses each informed consent claim in turn.

### i.  Failure to Provide Adequate Informed Consent to Dowling

"The gravamen of an informed consent claim . . . is a healthcare provider's duty to

communicate information to enable a patient to make an intelligent and informed choice, after

full and frank disclosure of material risk information and the benefit of data regarding a proposed

course of medical treatment."  *McQuitty v. Spangler*, 410 Md. 1, 22 (2009) (*McQuitty I*).  In *Sard

v. Hardy*, the Court of Appeals of Maryland held that physicians maintain a duty to disclose "the

nature of the ailment, the nature of the proposed treatment, the probability of success of the

contemplated therapy and its alternatives, and the risk of unfortunate consequences associated

with such treatment."  281 Md. 432, 440 (1977)*; see also Univ. of Maryland Med. Sys. Corp. v.

Waldt*, 411 Md. 207, 235 (2009).  There, Dr. Hardy failed to inform Ms. Sard of a two-percent

risk that her tubal ligation would not prevent a future pregnancy.  *Sard*, 281 Md. at 437.  The

failure to advise of that known risk amounted to a failure to provide informed consent.

In so holding, the *Sard* court articulated that a material risk "is one which a physician

knows or ought to know would be significant to a reasonable person in the patient's position in

deciding whether or not to submit to a particular medical treatment or procedure."  *Id.* at 444.

The court emphasized that a "mini-course in medical science is not required," and that "a

physician is not burdened with the duty of divulging all risks, but only those which are material

to the intelligent decision of a reasonably prudent patient."  *Id.* (internal marks and citation

omitted). Accordingly, Dowling must demonstrate that the failure to advise as to motility and risk of congenital defects, if known, would cause a reasonable person in the Dowlings' place to withdraw consent to proceed with ICSI, and instead pursue IVF without ICSI. *Id.* at 450.

The Court begins with the more straightforward of Dowling's theories—Defendants' failure to apprise the Dowlings of the known risks for birth defects associated with ICSI. The Court finds that as pleaded, the informed consent claim survives challenge. According to the ICSI consent form, the Dowlings were told that as of July 2012, ICSI may involve "*unknown risks to the baby*," and that "[w]hile there seems to *be no higher overall incidence of congenital malformations in children born after ICSI* . . . the risk cannot be totally ruled out." ECF No. 1-6 at 7 (emphasis added). However, during that same time, the scientific and medical community had grown increasingly aware that ICSI produced adverse outcomes regarding congenital malformation. ECF No. 1 ¶¶ 80–84. Scientific and medical literature as early as 2006 had noted that an "increased rate of birth defects is shown by the trend for increased spontaneous abortions in several ICSI studies where pregnancies were obtained . . . ." ECF No. 1 ¶ 82. By 2010, studies reported "a statistically significant negative effect on embryo quality and pregnancy outcomes in ICSI patients," and "[a]n increased risk of chromosomal abnormalities has been shown in ICSI offspring." *Id.* ¶ 83. By 2011, a meta-data study assessing the outcomes of 28 other studies concluded that "the influence of sperm DNA damage on embryo quality/development may be more significant in ICSI compared to IVF cycles" because with ICSI the "natural selection barriers are bypassed entirely and fertilization with highly DNA fragmented sperm is possible." *Id.* ¶ 84.

The consent form never mentioned any such risk, and in fact stated the opposite: that the risks were "unknown" at the time. The failure to advise the Dowlings of the risks for congenital

defects associated with ICSI is the very kind of information that could change whether parents like the Dowlings proceed with ICSI or instead use conventional IVF.  This would be especially important to individuals like Dowling.  He was taking medication with a known complication of increased DNA fragmentation which, when combined with ICSI, further increased the risk of birth defects.  The Complaint, taken as true and most favorably to Dowling, therefore, states a sufficient claim for failure to obtain informed consent.

The Court similarly denies dismissal on Dowling's alternative informed consent theory— that Defendants failed to inform Dowling that the recommendation for ICSI was based on the initial March 2012 semen sample, not the sample taken on the day of fertilization which exceeded the ICSI motility threshold.  Viewing the Complaint allegations as true and most favorably to Dowling, A.R.T. recommended ICSI because of the "low initial motility" of the original March 2012 sample.  Yet the forms provided to Dowling at the time of fertilization failed to explain this distinction and did not disclose that the sample to be used for ICSI actually exceeded the ICSI motility threshold.  ECF No. 1 ¶ 48.  Discovery on this theory will be especially helpful in ascertaining the particular information communicated to Dowlings as well as Defendants' role in the Dowlings' consent process.  *See, e.g.*, *Sard*, 281 Md. at 443−44 ("The scope of the physician's communications to the patient, then, must be measured by the patients need, and that need is whatever is material to the decision.  Thus, the test for determining whether a potential peril must be divulged is its materiality to the patient's decision.").

Defendants respond that dismissal is warranted because an informed consent claim under Maryland law is confined only to physicians, and none of the A.R.T. staff are "physicians."  Although the Court credits that informed consent claims in Maryland have largely centered on a physician's failures, *see Sard*, 281 Md. at 440, the Court of Appeals also broadened application

to impose the duty on "healthcare providers" more generally. *McQuitty I*, 410 Md. at 5. The Defendants have not provided any authority that Maryland affirmatively limits informed consent claims only to physicians.

Further, to dismiss the claim on this ground would allow A.R.T. to escape all liability for the very "medical" role that it agreed to assume. By the terms of its own contract with WRNMMC, A.R.T. provided embryology services as a "healthcare provider." ECF No. 1-4 at 1.0.1.1. A.R.T. agreed to "supply all labor, materials, equipment and supervision for developing and staffing an In-Vitro Fertilization (IVF) laboratory," at WRNMMC. *Id.* at 1.0.1. This included "intracytoplasmic sperm injection (ICSI), assisted embryo hatching (AH), blastocyst transfer, and embryo biopsy," as well as "cryopreservation of eggs, embryos, and sperm." *Id.* at 1.6.1 (emphasis omitted). As "healthcare providers," A.R.T. staff also participated in the "continuing medical education process" at WRNMMC and trained the WRNMMC staff, residents and fellows. *Id.* at 1.6.14.

Most relevant to the consent question, A.R.T. was responsible for securing patients' informed consent to IVF and ICSI procedures. A.R.T. expressly agreed to provide "adequate materials for patient education, including information booklets outlining procedures performed, their risks and benefits and the indications for these procedures." *Id.* at 1.6.15. A.R.T was similarly responsible for other patient education, to include instructing "patients on all aspects of medication use, monitoring and appropriate follow-up," as well as "injection technique classes to all patients." *Id.* Finally, A.R.T. agreed generally to perform its services "in accordance with established principles, practices, and ethics of the medical, nursing and specialty professions/organizations." *Id*. at 1.6.19.

The contract alone establishes that A.R.T. providers are sufficiently "medical" to pull them within the ambit of an informed consent claim, at least at this stage of the case. Certainly, it would be a strange result that A.R.T. must secure informed consent to perform a medical procedure which literally creates life, yet escape liability if its consent process is lacking. Because the Court finds at this stage that Defendants have assumed the duty to obtain informed consent in the context of the medical procedures for which Defendants were responsible, Dowling's informed consent claim survives challenge. After the parties generate a more robust factual record on the roles that A.R.T. and Cullingford played in the consent process, and their involvement in the provision of health care to the Dowlings, the Court will revisit this question.

### ii. Survivorship and Wrongful Death Claims (Counts III and IV)

The Court next addresses whether the wrongful death and survivorship claims brought on behalf of J.A.D. may proceed. Dowling asserts that the same failures of consent caused the Dowlings to unwittingly choose ICSI which proximately caused J.A.D. to be born, suffer, and die from severe congenital defects. Dowling brings a wrongful death claim on behalf of himself and his wife for the losses of support and companionship resulting from J.A.D.'s death. Dowling also brings a survivorship claim as the personal representative of his estate for the injuries that J.A.D. could have pursued had he survived.

Defendants lodge an array of attacks primarily aimed at the survivorship claim. Defendants principally contend that the survivorship claim is nothing more than a thinly veiled attempted to assert a "wrongful life" tort claim unavailable in Maryland. Alternatively, Defendants urge dismissal because the survivorship claim is barred by limitations. To best understand this Court's decision on these arguments requires preliminary discussion of the interplay between wrongful death and survivorship actions under Maryland law.

Both wrongful death and survivorship actions are creatures of statute. Although each are distinct claims, they are brought only incident to and after a death caused by the defendant. Md. Code Ann. Est. & Trusts § 7-401(y)(1) (survivorship); Md. Code Ann. Cts. & Jud. Proc. § 3-904 (wrongful death); *see also Carter v. Wallace & Gale Asbestos Settlement Tr.*, 439 Md. 333, 362 (2014). A survivorship action is pursued by the personal representative of the decedent's estate for claims that the decedent could have prosecuted "against a tort-feasor for a wrong which resulted" in his death. Md. Code Ann. Est. & Trusts § 7-401(y)(1)(ii); *see also Beynon v. Montgomery Cablevision Ltd. P'ship*, 351 Md. 460, 474–75 (1998) ("Under [the survival statute] the damages recoverable are such as the deceased sustained in his lifetime and consequently exclude those which result to other persons from his death . . . . [T]here *is* a survival of a cause of action which the decedent had in his lifetime.") (quoting *Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 339–40 (1906)). Recovery, therefore, is limited to damages that the decedent could have recovered, as well as for his "pain and suffering," funeral expenses, and "expenses between the time of his injury and his death." *Smallwood v. Bradford*, 352 Md. 8, 25 (1998) (quoting *Stewart*, 104 Md. at 343). Although the personal representative indeed brings a survivorship claim, the estate benefits from any monetary award. *Id.* The survivorship claim must be brought within three years of the decedent's death. Md. Code Ann. Cts. & Jud. Proc. § 5-101; *Geisz v. Greater Baltimore Med. Ctr.*, 313 Md. 301, 306 (1988).

A wrongful death action is brought "for the benefit of the wife, husband, parent and child of the deceased person" where the defendant's "wrongful act causes the death of another." Md. Code Ann. Cts. & Jud. Proc. §§ 3-902, -904. A wrongful death "stem[s] from the same underlying conduct, which must have resulted in the decedent having a viable claim when [he] was injured." *Mummert v. Alizadeh*, 435 Md. 207, 222 (2013); *see also id.* at 221 (citing *Frazee*

*v. Balt. Gas & Elec. Co.*, 255 Md. 627 (1969) (contributory negligence); *Balt. & Potomac R.R. v. State ex rel. Abbott*, 75 Md. 152, 23 A. 310 (1892) (assumption of risk); *Smith v. Gross*, 319 Md. 138 (1990) (parental immunity); *State ex rel. Bond v. Consol. Gas, Elec. Light & Power Co.*, 146 Md. 390 (1924) (no privity of contract between decedent and manufacturer)); *Spangler v. McQuitty,* 449 Md. 33, 60 (2016) (*McQuitty III*).[6]  A wrongful death claim must be brought "within three years after the death of the injured person."  Md. Code Ann. Cts. & Jud. Proc. § 3-904(g)(1).

Against this statutory backdrop, the Court turns to the survivorship action brought on behalf of J.A.D.  Defendants principally contend that the claim fails because it is, essentially, an action to assess liability for J.A.D.'s "wrongful life."  Dowling, in response, maintains that this action is distinct from the otherwise prohibited "wrongful life" claims because it is rather a "case about consent," and that the injuries to J.A.D. arose from the Dowlings having chosen ICSI over IVF because the informed consent process was lacking.

Defendants are correct that in *Kassama v. Magat*, the Maryland Court of Appeals refused to recognize a cause of action brought on behalf of a child for the "fact that she was born."  368 Md. 113, 137 (2002).  In *Kassama*, the court was called to decide whether a medical negligence action could be brought on behalf of a minor child born with Down Syndrome after the mother's physician failed to inform the mother of the heightened risk that her unborn baby suffered from the congenital disorder.  *Id.* at 116.  Had the mother been afforded this information, she would have aborted the fetus, and the child on whose behalf the action was filed would never have been born. *Id.*

---

[6] An important exception to this rule is that a wrongful death claim may be brought even if the underlying cause of action is barred by limitations.  *See Mummert*, 435 Md. at 228; *McQuitty III*, 449 Md. at 49.

In deciding as a matter of first impression, the *Kassama* court exhaustively surveyed the myriad ways in which such claims had been brought by or on behalf of "impaired children asserting that, as a result of the defendant's negligence, their parents were precluded from making a decision to abort the pregnancy." *Id.* at 135. The court also underscored that in *Kassama,* the defendant-physician had done nothing to "cause" the baby to be born with Down Syndrome; rather, the wrongdoing was a failure to diagnose that which naturally occurred. "The injury" was the mother's inability "to terminate the pregnancy and *avert her birth*." *Id.* at 137 (emphasis added). The court thus framed the question to be answered as "whether Maryland law is prepared to recognize that kind of injury—the injury of life itself." *Id.*

The court answered this question in the negative, and held that "for purposes of tort law, an impaired life is *not* worse than non-life, and, for that reason, life is not, and cannot be, an injury." *Id.* at 148. The court aptly noted that in such cases, the measure of injury is that between the child born as injured versus not having been born at all, and reasoned that

> [u]nless a judgment can be made, however . . . that non-life is preferable to impaired life—that the child-plaintiff would, in fact, have been better off had he or she never been born—there can be no injury, and if there can be no injury, whether damages can or cannot be calculated becomes irrelevant.

*Id.* at 148.

The court concluded it would not recognize such a tort because "the crucial question" at the heart of such a claim is the "value judgment about life itself," which is "too deeply immersed in each person's own individual philosophy or theology to be subject to a reasoned and consistent community response, in the form of a jury verdict." *Id.* at 149. In so doing, the court focused not on the precise cause of action—professional malpractice versus informed consent. The court instead refused to recognize the claim because to do otherwise would compel the

factfinder to weigh as the "injury" (and accordingly assess damages) as being born with Down Syndrome versus not being born at all.

The Court of Appeals, however, left unanswered that which is presented here: where the Defendants' failure to obtain adequate consent led parents to agree to a fertilization procedure (ICSI) which *itself caused the injury* to the conceived child, does the child maintain a legally cognizable cause of action? *Cf. id.* at 149 (rejecting the "recovery of extraordinary life expenses on some theory of fairness—that the doctor or his or her insurance company should pay *not because the doctor caused the injury or impairment* but because the child was born") (emphasis added). Unlike *Kassama*, where the "injury" to the child was indisputably an act of nature, J.A.D. suffered injury because he was conceived via ICSI as opposed to traditional IVF.

In this respect, the Court of Appeals, which has not since *Kassama* explored the decision's limits or contours, may well find this action to be more akin to those claims brought on behalf of the child "for injuries sustained by the child prior to viability." *Id.* at 134 (citing *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 119 (1983) (wrongful death cause of action where physician's negligence resulted in premature birth). In such actions, the Defendants are held accountable for the injuries caused to the unborn child by virtue of the Defendants' tortious conduct. *See, e.g.*, *Jorgensen v. Meade Johnson Labs.*, 483 F.2d 237, 240–41 (10th Cir. 1973) (allowing action on behalf of deceased child's estate and living twin for birth defects caused by birth control pill which altered mother's chromosomal structure causing birth defects); *Vasquez v. Roy*, No. 146024908S, 2018 WL 3403410, at *3 (Conn. Super. Ct. June 18, 2018) (recognizing cause of action on behalf of child where defendant physician's failure to warn mother of risks associated with failed attempt to induce early termination of pregnancy with methotrexate that led to infant being born with severe defects); *Lough v. Rolla Women's Clinic*,

866 S.W.2d 851, 853–55 (Mo. 1993) (failure to provide RhoGAM after first birth led to second child's severe congenital defects; action on behalf of second child allowed to proceed even though child was "as yet unconceived" at time of alleged tortious conduct); *cf. Doolan v. IVF Am. (MA), Inc.*, No. 993476, 2000 WL 33170944, at *4 (Mass. Super. Nov. 20, 2000) (recognizing cause of action where "the negligence of the defendant caused the minor plaintiff to be born with severe defects when he/she would have otherwise been born healthy," but denying cause of action for child born with cystic fibrosis as a result of Defendant IVF clinic implanting embryo with gene mutation because defendants did not do anything to "directly cause" the child's affliction).

Although not perfectly analogous, these cases stand for the proposition that a cause of action on behalf of the child may lie where claimed injury sustained to the child occurred at the hands of defendant before or during conception. Similarly, if Defendants' failure to provide informed consent led the Dowlings to choose ICSI which caused J.A.D.'s defects, this case does not necessarily fail under *Kassama*.[7]

This Court further recognizes that J.A.D.'s cause of action parts with *Kassama* as to the nature of the injury. Dowling does not identify J.A.D.'s injuries as those discussed in

---

[7] A national canvass has uncovered no comparable challenge to fertilization techniques such as ICSI leading to conception injuries. Unlike Maryland, which has not revisited *Kassama* since its issuance, other states have rejected "wrongful life" causes of action for children born using assisted reproductive techniques. *See, e.g.*, *Zelt v. Xytex Corp.*, No. 18-11164, 2019 WL 423052, at *2 (11th Cir. Feb. 4, 2019) (no cause of action under Georgia law for child born with potential for future disabilities because claims "necessarily entail pleading an injury equal to the difference in the value of a child's life" as the product of sperm donor fraud "and the value of a child's life with a different donor"); *D.D. v. Idant Labs.*, 374 F. App'x 319, 324 (3d Cir. 2010) (refusing to recognize action on behalf of child where sperm bank withheld chromosomal defects of sperm used for insemination; child's claim essentially depended on accepting that her "genetic makeup is her injury"); *B.F. v. Reproductive Med. Assocs. of New York, LLP*, 136 A.D.3d 73, 77 (N.Y. App. Div. 2015) (no cause of action against doctor and IVF clinic for failure to screen donor eggs on behalf of child born with defects because the claim would depend "upon a comparison between the Hobson's choice of life in an impaired state and nonexistence"); *Tomlinson v. Metro. Pediatrics, LLC*, 362 Or. 431, 472 (2018) (no cause of action where defendants' failure to diagnose genetic disorder in older sibling led to younger sibling's conception; to hold otherwise would "necessarily depend[] on the premise that [infant-plaintiff] had a legally protected interest in not being born, rather than risk being born with" hereditary defects).

*Kassama*—the difference between being born with pentalogy of Cantrell versus not being born at all. Rather, J.A.D.'s claim is that because the failed consent process caused the parents to use ICSI as opposed to traditional IVF, the injury is the quantifiable difference between J.A.D. being born with or without defects.

At first blush, Dowling's argument seems to rest on an intellectual sleight of hand not warranting reflection beyond *Kassama*. If a successful consent process would have caused the Dowlings to *not* choose ICSI, then query how Dowling will also demonstrate that J.A.D. would have been born through IVF. If he cannot prove as much, then J.A.D.'s claim remains in the same posture as *Kassama*—J.A.D.'s injury is measured by comparing his life with defects against never being born at all.

Upon deeper reflection, however, the Court recognizes that in *Kassama,* the nature of the child's disability contributed to the court's reluctance to find a cause of action, and that as to J.A.D., the court may not approach the matter with the same hesitancy. Unlike a child with Down Syndrome, J.A.D. suffered physical injury because of how he was conceived. His disability necessitated multiple life-threatening surgeries and prolonged hospital stays, ending unquestionably in his death. These are the very kind of injuries which juries are accustomed to weighing, judging and, if liability is found, monetizing. In this respect, the factfinder here need not wrestle with whether J.A.D. "can lead [a] useful, productive, and meaningful [life]" in that he could "be educated, that [he is] employable, that [he] can form friendships and . . . get along in society." *Kassama*, 368 Md. at 148–49. J.A.D. clearly could not, and did not, ever enjoy most of these quintessentially human experiences. Accordingly, the ultimate question of quantifying his injury would not be fraught with the same peril as in *Kassama*.

Whether *Kassama* extends to this case is not for this Court to decide. *See* Md. Code Ann. Cts. & Jud. Proc. §12-603 (permitting Maryland Court of Appeals to answer question of law certified by a court of the United States "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State"). Because this question is not squarely resolved by *Kassama,* and the Court of Appeals has yet to revisit *Kassama* in nearly two decades, *Kassama's* application to the survivorship claims is best left for the Court of Appeals. *See Kassama*, 368 Md. at 134 ("The actions now before us are of a type that were not and, as a practical matter, could not have been, brought before the last half of the Twentieth Century."). If after discovery Dowling's informed consent claim survives summary judgment, then the merits of the survivorship action will be ripe for Court of Appeals decision, and on a more robust factual record than currently available.[8]

Defendants alternatively assert that the survivorship claim is time-barred because it was not brought within three years after J.A.D.'s death. Md. Code Ann. Cts. & Jud. Proc. § 3-904(g)(1). In response, Dowling contends that the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 3936, tolls the claim. The SCRA provides that:

---

[8] As discussed during the hearing, if the informed consent claims survive summary judgment and the Court certifies the question of whether *Kassama* bars suit on behalf of J.A.D, the Court is also inclined to certify whether Defendants owed the same duty of providing adequate informed consent as "healthcare providers." Similarly, if this case reaches the certification stage, the Court of Appeals may reach Defendants' subsidiary argument that the consent claim cannot proceed on behalf of J.A.D. because no duty exists to a child not yet conceived. This Court fails to see the merit of this argument when considering that Maryland law recognizes a duty to provide adequate consent to parents who must, as proxies, provide consent for their infant. *See Grimes v. Kennedy Krieger Inst., Inc.*, 366 Md. 29, 113 (2001); *see also McQuitty I*, 410 Md. at 5 (allowing breach of informed consent claim to go forward on behalf of infant child injured by physician's failure to provide mother adequate consent as to course of prenatal treatment). This duty has been extended even to those not yet conceived. *See, e.g., Renslow v. Mennonite Hosp.*, 67 Ill.2d 348, 357 (1977) (recognizing independent duty of care to fetus not yet conceived at time physician negligently caused mother's blood to become RH sensitized, noting "there is a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother"). However, the Court also recognizes that, once again, this issue is most appropriately viewed as part and parcel of whether a cause of action on behalf of J.A.D. is legally cognizable under Maryland law.

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

*Id.* at 3936(a).

Notably, the SCRA "is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner*, 319 U.S. 561, 575 (U.S. 1943). Where an active servicemember brings a claim on his own behalf, the time for filing may be tolled during the plaintiff's active service. However, where, as here, the servicemember brings claims in a representative capacity, the SCRA's applicability is not as straightforward. At least one other court has read the SCRA to cover survivorship claims brought by the servicemember as the estate's personal representative where the plaintiff servicemember was the sole surviving heir. *See Wilcox v. Les Schwab Tire Crs. of Oregon, Inc.*, 293 Or. App. 452, 457 (2018). This Court also notes that the SCRA's plain language does not distinguish between claims "brought by" a servicemember as a personal representative for an estate, or ones "brought by" him for injuries that he sustained. *Cf. id.* at 455. Accordingly, the reasoning of *Wilcox* has some intuitive appeal.

That said, the Fourth Circuit Court of Appeals' decision in *Kerstetter v. United States* suggests a different result. 57 F.3d 362 (4th Cir. 1995). In *Kerstetter*, the court was asked to review the SCRA's applicability to a servicemember's claims for medical expenses arising from the injuries sustained by his minor daughter in connection with a medical malpractice action. *Id.* at 363. Although the claims were otherwise time-barred, the plaintiff argued that the SCRA's tolling provision saved them. *Id.* The court reversed the district court's determination that the

servicemember's claims were time-barred and held that the SCRA tolled those claims. *Id.* at 368. The Fourth Circuit reasoned that where a servicemember brings claims which, under the animating state law, capture independent injuries to the servicemember (such as medical expenses sustained) the SCRA tolls those claims. *Id.* at 369. By contrast, the SCRA did not toll the claims that the plaintiff had brought on behalf of his minor daughter for injuries she had sustained. *Id.* at 366. Because the SCRA applies only to members of the armed forces, the statute "d[id] not have even potential application" to claims brought on behalf of the child. *Id.*

As with claims concerning the minor's injuries in *Kerstetter*, the survivorship action seeks damages for injuries sustained only to J.A.D. In this respect, no meaningful distinction exists between claims brought by parents of a surviving child and claims brought on behalf of a deceased child that could have been brought had he lived. However, *Kerstetter* is *dicta* on this question because the plaintiff agreed not to pursue the child's claims. *Id.* at 364.

At this juncture, the Court need not yet address whether the SCRA tolls the survivorship claim for this simple fact—if Dowling's consent claims ultimately fail as a matter of law, so too do the wrongful death and survivorship actions. *McQuitty III,* 449 Md. at 54 (noting that wrongful death and claims of decedent "stem from the same underlying conduct, which must have resulted in the decedent having a viable claim when she was injured") (quoting *Mummert*, 435 Md. at 222). Because this issue may, in the end, be mooted if the Dowlings' consent claim does not survive summary judgment on the merits, the Court defers ruling until such becomes necessary.

## B.     Negligent Misrepresentation (Counts V and VI)

Dowling's claims for negligent representation as to embryologist Cullingford (Count V) and to A.R.T. through vicarious liability (Count VI) are based on the July 6, 2012 Semen

Collection and Analysis Form. ECF No. 1-8. The form reflects the analysis of Dowling's sperm sample used for fertilization. Specifically, the first half of the form reports that the sample results were 48% "Pre Wash" motility and 86% "Post Wash" motility. *Id.* at 2. The second half of the form states:

> **Notice to Patient:**
>
> The sample that has been prepared <u>is of ICSI standards</u>. Therefore, your oocytes will undergo ICSI in order to obtain fertilization. <u>If ICSI is needed</u> and has not already been paid for, a bill for the difference will be sent. Your initials indicate that you agree to the procedure (ICSI) listed above.
>
> Patient Initials: ( __ ) ICSI (if applicable) due to: Low Initial Motility

*Id.* at 2 (emphasis added).

Dowling contends that Defendants misrepresented that the sample met the motility threshold for ICSI when in fact this specific sample exceeded the threshold and thus Dowling should have been apprised of that fact. ECF No. 1 ¶ 143. To sustain a claim for negligent representation, a plaintiff must demonstrate: (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence. *Vill. of Cross Keys, Inc. v. U.S. Gypsum Co.*, 315 Md. 741, 755–56 (1989) (citing *Weisman v. Connors*, 312 Md. 428, 443–48 (1988)).

Viewed in the light most favorable to Dowling, this claim must proceed. Defendants singularly argue that the claim fails as to the first element because the information on the form is "indisputably true;" Dowling's "initial" sample met ICSI standards and the values represented on

the July 2012 form are also accurate.  ECF No. 7-1 at 32.  However, read most favorably to

Dowling, the falsehood lies in the assertion on the form that "the sample <u>that has been prepared</u>

is of ICSI standards," when in fact the prepared sample was *above* ICSI standards.  Further, the

term "low <u>initial</u> motility," when read in conjunction with the actual results that day, appears to

mean that the first "pre-wash" sample is the reason why ICSI was chosen.  Nothing on the form

indicates to Dowling that "initial motility" refers to the results of prior samples.  Thus, on the

face of the document, Dowling was not told the truth regarding that specific sample in that it

*exceeded* the motility threshold for ICSI.  The remaining elements of the claim are not

challenged and are sufficiently pleaded to survive dismissal.  Defendants' motion is DENIED as

to Counts V and VI.

### C.     Constructive Fraud (Counts VII and VIII)

The Complaint avers that Cullingford and A.R.T. owed a duty to Plaintiff under the

informed consent doctrine and A.R.T.'s contract with the government "to accurately and

adequately provide material information" concerning the July 6 Semen Collection and Analysis

Form discussed above.  ECF No. 1 ¶ 158.  The withholding of such material information

regarding the motility of the sample forms the basis of the constructive fraud claim.  *Id.* ¶¶ 159–

64.

Constructive fraud occurs when the Defendant breaches "a legal or equitable duty which,

irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its

tendency to deceive others, to violate public or private confidence, or to injure public interests."

*Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374, 421–22 (2006) (quoting *Md. Envtl. Tr.

v. Gaynor*, 370 Md. 89, 97 (2002)).  Constructive fraud "generally arises in a context of trust or

confidence, such as a fiduciary duty or confidential relationship."  *Chassels v. Krepps*, 235 Md.

App. 1, 16 (2017). "A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. . . . [I]t is particularly likely to exist where there is . . . such a relation of confidence as that which arises between physician and patient . . . . " *Buxton v. Buxton*, 363 Md. 634, 654 (2001) (citation omitted). "[C]onstructive fraud requires clear and convincing proof and is not lightly found by the courts." *E.F. Hutton Mortg. Corp. v. Equitable Bank, N.A.*, 678 F. Supp. 567, 581 (D. Md. 1988).

Defendants contend that dismissal is warranted because Dowling has failed to plead a special or confidential relationship with Defendants necessary to maintain a constructive fraud claim. Defendants' argument rests on the more basic contention that Defendants owed no duty to the Dowlings to provide adequate informed consent. For the same reasons discussed regarding the informed consent claim, and viewing the factual allegations most favorably to Dowling, a sufficient duty has been pleaded to survive challenge.

Defendants further argue that the Complaint does not adequately plead that Defendants breached any duty to Dowling. However, the Court has already determined that the Complaint pleads sufficient material misstatements or omissions during the consent process that are plausibly attributable to A.R.T. and Cullingford. Accordingly, the motion to dismiss the constructive fraud claims must be denied.

### IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED. Plaintiff's motion for partial summary judgment is GRANTED as to the effect of the FTCA Settlement Agreement. Plaintiff's request to file motion to file supplemental briefing, ECF No. 33, is DENIED as moot.

A separate Order follows.

3/6/2019
Date

_____/S/_____
Paula Xinis
United States District Judge